CLARK (NIETO v.). See Cases Nos. 10,261 and 10,262.

CLARK (NORTH v.). See Case No. 10,308.

CLARK (PACKWOOD v.). See Case No. 10,656.

———

## Case No. 2,831.

### CLARK et al. v. PEASLEE.

[1 Cliff. 545;[1] 26 Law Rep. 609.]

Circuit Court, D. Massachusetts. Oct. Term, 1860.

CUSTOMS DUTIES — STORAGE OF IMPORTATIONS IN PRIVATE STORE—HALF-STORAGE—CONSTRUCTION OF STATUTES—EFFECT OF REPEAL.

1. Where importations were deposited by the importer in his own store, under the act of March 28, 1854 [10 Stat. 271], *held*, that the collector correctly required the importer to pay half-storage, under the treasury regulations, February 17, 1849.

2. The regulations of July 2, 1855, did not have the effect to repeal those of February 17, 1849.

3. Where there is no repealing clause, subsequent regulations only have the effect to repeal those previously existing, to the extent that the last issued are clearly repugnant to the former.

4. Under the regulations of February 17, 1849, the importer, before he can use his own store for the deposit of importations, must indorse on the entry an agreement to pay the collector an amount equal to the salary of an inspector, or one half storage, and the importer must make his election in advance.

5. In the treasury regulations of July 2, 1855, the alternative provision for the payment of half-storage is dropped.

6. The regulations of 1857 provide that the importer shall pay monthly to the collector such sum as the collector deems proper for the service, not less, however, than the pay of the officer in attendance.

7. Where an importer, under the act of March, 1854, elected to deposit the goods in his own store, *held*, that he was not deprived of that right by being required to pay half-storage, and that such requirement by the collector was properly made, as the store was "a private bonded warehouse," and the owner as importer was bound to pay "appropriate expenses."

[Cited in U. S. v. Macdonald, Case No. 15,668, 5 Wall. (72 U. S.) 658.]

8. When the interpretation of the revenue laws and regulations is invoked, considerable weight should be given to the practice of the government as a contemporaneous construction of the provisions under consideration.

9. Goods deposited in private stores by the importer are to be taken possession of by the collector, at the charge and risk of the owners; consequently the goods are in the custody of the United States, and in charge of an inspector.

At law. Action of assumpsit to recover back certain duties on imports, paid under protest. The goods, consisting chiefly of fish and oil, were imported and duly entered for warehousing. The first entry was made January 23, 1855. Application in writing was made by the plaintiffs [William R. Clark and others], to the defendant [Charles H. Peaslee], collector of the customs in Boston, for leave to warehouse the importation in their own store, which was granted; and on withdrawing the same for consumption, they paid twenty-five dollars and twenty cents as half-storage, in addition to the regular duties. Various other entries were made by them of similar goods, and in all cases similar exactions were made of them, and were all paid under protest. All of the entries were made under the acts of congress concerning the warehousing of imported goods, and the half-storage was claimed by the defendant under those laws, and the regulations of the treasury department. Suit was commenced April 1, 1859, and the declaration [as amended][2] embraced sums paid by the plaintiffs from March 31, 1854, to August 14, 1855. Defendant pleaded non-assumpsit [and at the October term the parties went to trial on that issue. Testimony was introduced by both parties],[2] and a verdict was taken for the plaintiffs for $1,813.35, subject to the opinion of the court, upon questions of law, and with authority to amend the verdict or enter a general verdict for the defendant. [Sufficient has already been remarked to show that the main question in this case is whether the charge of half storage was a proper one to be made, under the circumstances disclosed at the trial. It is insisted by the plaintiffs that the charge was unauthorized and illegal, and consequently that the verdict is right. On the other hand it is insisted by the defendant that the charge was a legal and proper one, and consequently that the whole claim of the plaintiffs is invalid and without foundation.][2] Amount was the only question to be settled if the plaintiffs were right; but if they were wrong, then the verdict was to be set aside and judgment entered for the defendant.

S. J. Thomas, for plaintiffs.

The plaintiffs, as importers, were by law entitled to the option to deposit their goods, at their expense and risk, either, 1. In any public warehouse owned or leased by the United States; or, 2. In their own private warehouse used exclusively for the storage of warehoused goods of their own importation or to their consignment; or, 3. In a private warehouse used by the owner, occupant, or lessee, as a general warehouse for the storage of warehoused goods.

In either case they were bound to bear the expense of depositing and keeping deposited; that is, the expense of storing. More than this the collector had no lawful authority to exact. He could not, nor could the treasury department for him, adopt such

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[2] [From 26 Law Rep. 609.]

rules or rates as to deprive the plaintiffs of the benefit of the warehouse system. The authority conferred on the secretary by the act of 1854 was to make rules and regulations to give effect to the act, not to deprive importers of the benefits of it. In the first and last cases, the rates must be reasonable. In the second case, the storage is the importer's own concern. If the importer elect to deposit in a public warehouse of the United States, he pays storage to the United States. But those rates must be reasonable. Foster v. Peaslee [Case No. 4,979], Oct. term, 1856, Curtis, J. If, on the contrary, he elect to deposit in a private warehouse used by the owner, occupant, or lessee as a general warehouse, he pays such storage to such owner, occupant, or lessee, and not to the United States. But such storage, too, must be reasonable. If, instead of depositing in a public warehouse of the United States, or in a general warehouse provided by another, he elect as he may, to deposit in a store provided by himself, of which he is the owner, or for which, as lessee, he already pays rent, then, of course, he is not to pay storage to another who does not provide it, and no more to the United States, who is not the owner and does not provide the place than to an individual who does not. The expense contemplated in the section under consideration, it is submitted, is plainly the expense of storing,—the expense of providing a place of deposit for the goods until they are withdrawn,—and that alone.

In this case, the goods were not deposited in either of these classes of stores. They were deposited in the plaintiff's own stores, but not stores used for the storage of warehoused goods exclusively, but stores used by the plaintiffs for goods warehoused by them, and goods not warehoused,—some of the latter which belonged to them, and others of which belonged to others. They were not under the lock of the customs, nor in the charge of any officer of the customs, nor in the joint custody of the owner and any officer of the customs, but in the actual custody of the plaintiffs, and at most only the constructive custody of the collector.

The regulation invoked by the defendant, under which it is claimed importers had the option whether to pay the salary of an inspector, or half-storage, it is submitted, had no application whatever to this case. In the first place, it will be observed, this regulation was made in 1849. The exactions of which the plaintiffs complain were all made after March, 1854. The regulation purports to be made under the authority of the act of August 6, 1846 [9 Stat. 53], and has reference, of course, to then existing laws. Now the provisions of the act of 1846 are quite different from those of the act of 1854. By the former the importer had no option; by the latter he had the option to warehouse his goods, at his own expense, in his own store. It was solely on the ground of this material

difference that Judge Sprague, who first tried this case, granted a new trial. The new trial was granted for the reason that that distinction had in the first trial been overlooked, and expressly on the condition that the plaintiffs should waive all claim on account of exactions prior to the passage of the last-mentioned act; and all such were stricken out. Under the act of 1846, the goods were to be deposited in public stores or in other stores to be agreed on by the collector or chief revenue officer of the port and the importer.

By the act of 1854, as before stated, the goods were to be deposited, at the option of the owner, in either a public warehouse of the United States, a private bonded warehouse, or the importer's own store, as he, the importer, might prefer and determine. By the act of 1846, the "other stores to be agreed on" were "to be secured in the manner provided by the first section of the act" of April 20, 1818 [3 Stat. 469]; that is, they were to be under the joint locks of the inspector and the importer. Not so, of course, the importers' private store mentioned in the act of 1854. In the second place, the regulation of 1849 purports to relate to bonded warehouses, and only those. It says: "All bonded warehouses under the act of August 6, 1846, will hereafter be known and designated as follows." It then proceeds to speak of three classes: 1. Stores owned or leased by the United States prior to that time; 2. Stores in the possession of an importer and his sole occupancy, "which he may desire to place under the customs lock"; and 3. Stores in the occupancy of persons desirous to engage in the business of storing.

By the act of 1846, the secretary of the treasury was authorized to make such needful rules and regulations, not inconsistent with the laws of the United States, as he might deem necessary to give effect to that act. In pursuance of that authority the secretary made the above three classes of warehouses; the law had suggested but two. They were all to be bonded. The classes spoken of in the regulation of 1849 were the secretary's classes. In 1854 the law made the classes. We have seen what they were. The first class was, stores owned or leased by the United States; the second, the importer's own store, the goods bonded, but not the store; the third, private bonded warehouses.

The difference between these acts was not wholly overlooked by the department. I find it noticed in a general regulation, by the secretary of the treasury, under date of March 30, 1854. "There are," he says, "several important provisions of this act, which require a modification of the warehouse regulations of the 17th of February, 1849." No regulation touching the terms of storing in the importer's own store was, however, made, I believe, until the general regulation of 1855. Meantime, the practice of exacting half-stor-

age, which had its origin even earlier than the warehouse system, was continued. At the former trial of this cause, a circular was introduced by the defendant, bearing date October 9, 1845, the substance of which was, that "where, at the instance and for the accommodation of the merchants, goods may be allowed by the proper officer of the customs in pursuance of law to be deposited in other than the regular public stores, it is deemed but just and reasonable that a charge of half-storage should be exacted on all such goods, to reimburse the United States to some extent for the expense of hiring public stores, and in which the collector might insist on such goods being deposited, subject to the full charge for storage." This is undoubtedly the origin of half-storage. It was instituted when the importer had no option secured to him by law, whether to use the public stores or his own, and when, therefore, the collector might perhaps impose terms as the condition of such option, and the importer as matter of convenience assented; and thus having grown up, it was continued, in derogation of the importer's right and against his will, after such option had been secured to him. It will be observed this circular does not rest the claim for the exaction upon any legal right.

If it be said the plaintiffs never applied to pay the salary of an officer instead of half-storage, there are two answers: First, the evidence shows there was but one condition on which the deputy collector was allowed to permit the plaintiffs to warehouse their goods in their own stores, and that was the payment of half-storage, and the plaintiffs had been repeatedly so told and so understood. Second, the option to store their goods in their own store, on condition of paying half-storage or the salary of an inspector, is not the option the law gave. The paragraph relied upon in the regulation of 1849 is as follows: "Before any importer shall be permitted to use his own store for class two, he shall indorse upon the entry for warehouse his written request to use such store as the place of deposit, and also indorse thereon an agreement to pay to the collector an amount equal to the salary of the inspector or one half storage, to be determined in advance by the inspector."

It will be observed that, unlike the regulation of July, 1855, this regulation does not provide that the importer may pay a just proportion of the salary of the officer, but the whole salary. Applied to a case like this, the rule is simply absurd. A merchant desires, for example, to warehouse one hundred barrels of fish. Having complied with the forms of law, he has the right, under the act of 1854, to warehouse these fish, at his own expense, in his own store; that is, he is to bear the expense of storing. There is no occasion for the services of an officer. He has given the required bond. The government is secured. There can be no conflict between him and the owners of other warehoused goods, for he has no other.

The plaintiffs were bound to bear the expense of storing; that is, the actual expense. The case was similar to cases under the debenture acts. There, as in this case, the importer gave bond, and took his goods to his own store, and then kept them till he was prepared to export them. No charge was ever made or claimed for the service of an officer, and of course none for storage. And if there had been any right to charge for the service of an officer, the charges in this case were wholly disproportionate. The money was paid under a controlling necessity arising from the circumstances under which the money was demanded, and it may be recovered back. Elliot v. Swartwout, 10 Pet. [35 U. S.] 137.

O. L. Woodbury, for defendant.

Was the regulation of the secretary of the treasury referred to in accordance with existing laws? As to the authority of the secretary to regulate the warehouse system. 10 Stat. 273. He was to make such regulations, not inconsistent with the laws of the United States, as he might deem necessary for the due execution of this act. The rates of storage were to be fixed by the secretary of the treasury, and were left to his regulations by this act. 10 Stat. 270. "Goods subject to duty * * * may be deposited at the option of the importer, at his expense and risk in," &c. The option given the importer in this statute was between the three classes of warehouses described in the section, and did not concern "his expense and risk." There is no pretence that this option was denied to the plaintiffs in fact or in theory; it is only insisted by the plaintiffs that they had a right to use their own stores without paying anything. The privilege of warehousing goods in bond has always been coupled with the condition that it should be at the expense and risk of the importer. Warehouse Act 1846 says, "at the charge and risk of the importer." Revenue Act 1799, § 56, says, "at the charge and risk of the owner." The act of 1841, § 6 [5 Stat. 432], authorizes the secretary of the treasury "to regulate the rates of storage." The power here granted was extended with the enlarging of the warehousing system in 1846 (section 5), "to make regulations not inconsistent with the laws, to give full effect to the provisions of this law, and to secure a just accountability." These several acts are to be construed together to constitute the whole warehousing system of the United States, and only those parts which are repugnant to later statutes are to be regarded as repealed.

The right to regulate the rates of storage granted in 1841 is not repugnant to any of the other powers given the secretary by subsequent statutes, and exists in full force. The revenue from storage is apportioned by the United States. See Act March 3, 1849, §

4 [9 Stat. 398]. The fact of the expense of the warehousing being a charge on the owner of the goods, and the right of the secretary to regulate the rates of storage being thus shown to exist, there only remains to be considered, whether the government was put to any expense whatsoever in the case at bar, so as to justify the levying of a rate where the store class two was used. The custody of the goods is in the United States during the period of warehousing. Act 1846, § 1. Duties to be paid in cash. Whenever the owner shall make entry for warehousing, "the goods shall be taken possession of by the collector and deposited in public store or other stores, &c., there to be kept, at the charge and risk of the owners, &c., and subject to their order on payment of proper duties and expenses." The mode of keeping is prescribed in various acts, the objects being safe-keeping, prevention of frauds, and the retaining of the actual goods until the duties are paid. Act 1818, § 5, and Act 1846, § 3, describe offences which may be committed as to these goods, and from which they are to be protected; Act 1846, § 5, "to secure a just accountability" for the goods. The treasury regulations of June 26, 1854, direct the mode of doing this, all of which are distinctly part of the expense of the warehousing in that division which relates to custody, and occurred in the case at bar. There is no pretence that custody and delivery service were not performed as to the plaintiffs' goods by the warehousing department of customs. The jurisdiction of the secretary to establish a rate of storage, and the rate being shown, and the fact that there was a custody service performed in consequence of the warehousing of plaintiffs' goods, the further fact remains that under the term "half-storage" the secretary classified and collected the expenses of custody and delivery of the goods. See Treasury Regulations, Feb., 1849, where the option given to the importer is to pay an absolute officer or custodian's salary, or "half-storage," as a composition; and, again, see Treasury Regulations, July 2, 1855, where half-storage is disused as a composition, and a division of the officer's salary among the private stores substituted. The term "storage" always has been held wider than the word "rent," and certain responsibility for care and safe-keeping devolves on warehousemen, not known or connected with those who rent stores to others. The word "half-storage," therefore, literally expresses a custody fee,—the safe-keeping. See Sim. Dict. Com. Terms; Webst. Dict. "Storage;" Brissac v. Lawrence [Case No. 1,888].

Again, had the duties been paid in cash, then no custody would have been required from the government; it was the use of the privilege of warehousing which put the government to the expense of custody in order to execute the existing laws; and by statute this expense was to be at the expense of the importer. The secretary of the treasury having jurisdiction, and there having been a custody service performed by the customs at the warehouse of the plaintiffs, there was no exaction in compelling the plaintiffs to make their election under the Treasury Regulations, Feb., 1849; and the fees were legally received by the collector.

CLIFFORD, Circuit Justice. Considering the nature of the question, it is evident that it cannot be satisfactorily solved without a careful review of the acts of congress concerning the warehousing of imported goods, and of the principal regulations and circulars of the treasury department upon the subject.

Warehousing, as a system, was established in the United States by the act of 6th of August, 1846. 9 Stat. 53. Among other things, the first section provides, that upon the failure or neglect to pay the duties within the period allowed by law, or whenever a warehouse entry shall be made in the prescribed form, the importation "shall be taken possession of by the collector," and be deposited in "the public stores or in other stores," to be agreed on by the collector and the importer, owner, or consignee; and by the same section, such stores are required to be secured in the manner provided for by the first section of the act of the 20th of April, 1818, entitled "An act providing for the deposit of wines and distilled spirits in public warehouse." Such goods are not only required to go into the possession of the collector, and be thus deposited under his control, but they are also required to be kept in the place of deposit at the charge and risk of the owner, importer, or consignee. Goods so deposited are at all times subject to the order of the owner, importer, or consignee, upon payment of the proper duties and expenses; but those are required to be secured by a bond to the satisfaction of the collector, in double the amount of the duties. Duties upon such goods are required to be paid within a prescribed period; and in case the goods remained in public store beyond that time, without payment of the duties and charges thereon, they were to be appraised and sold by the collector at public auction, and the proceeds, after deducting the usual rate of storage at the port, with all other charges and expenses, including duties, were to be paid to the owner, importer, or consignee. Whether the merchandise is deposited in the public stores, or in the other stores therein described, there is not one of the provisions here referred to which does not assume that the goods are in the possession and under the control of the collector; and whether deposited in a public or private warehouse, it is clear that the goods cannot be withdrawn for consumption without the payment of the duties; nor for transportation or exportation, except by paying the appropriate expenses. Most of the provisions of the act are general in their phraseology, and doubtless were made so, because the system was new

and untried in this country; and they were necessarily framed and passed without the light of experience. Details, for the most part, were apparently avoided, but the fifth section authorized the secretary of the treasury, from time to time, to make such regulations, not inconsistent with the laws of the United States, as might be necessary to give full effect to the provisions of the act, and secure a just accountability under the same. By virtue of the authority conferred under that provision, the secretary of the treasury, on the 17th of February, 1849, promulgated an extended circular of instructions and forms, in place of those previously issued, with a view to enlarge the benefits of the warehouse system in this country. Treas. Cir. & Dec. (Ogden) p. 118. Those regulations greatly advanced the system by supplying important details, and prescribing the mode in which the system was to be carried into effect.

Some few details, however, were prescribed in the act itself, which must not be overlooked in this investigation. Importations in warehouse were assumed to be in the possession and under the control of the collector, and were to be kept at the charge and risk of the owner, importer, or consignee, and when withdrawn from warehouse, the appropriate expenses were to be paid by such owner, importer, or consignee. "Appropriate expenses" are the words of the act, but the expenses are in no way defined, except by necessary implication, arising from the obligation imposed of keeping the merchandise. Custody and control of merchandise in warehouse necessarily involve the expense of storage, superintendence, cartage, and drayage. All of these elements of charge are obviously included in the term "appropriate expenses," but the amount is not prescribed, and was necessarily left to be ascertained under the regulations of the department.

Moneys derived from that source are recognized by the act of the 3d of March, 1841, as public moneys, and collectors are required to pay the same into the treasury of the United States. 9 Stat. 349; U. S. v. Walker, 22 How. [63 U. S.] 313. Bonded warehouses, under the regulations of the 17th of February, 1849, were divided into three classes: 1. Public stores, or stores owned by the United States, or leased by them prior to the date of the regulations; 2. Stores in the possession and sole occupancy of the importer, and placed under a customs lock and that of the occupant, for the purpose of storing importations of the importer; 3. Similar stores in the occupation of persons desirous of engaging in the business of storing dutiable merchandise. Such classification was not, in terms, required by the act under consideration; but, in view of the explanations already given, it may be assumed that it was fully authorized by the fifth section.

Looking at the details of those regulations, and comparing them with the provisions of the act of the 28th of March, 1854, it will be seen that many of the latter were substantially borrowed from those regulations. Changes, undoubtedly, were made, and some entirely new provisions were enacted; but, in many respects, there is a marked similarity between the old regulations and the new law upon the same subject. All merchandise subject to duty might be warehoused under the act of 6th of August, 1846; but the regulations contained a provision that perishable articles and gunpowder, firecrackers, and other explosive substances, should be sold forthwith, or at the earliest day practicable, which rendered the privilege valueless in respect to all such articles; and the first section of the new law accordingly excluded those articles altogether from the benefit of the system. Other imported goods subject to duty, and which have been duly entered and bonded for warehousing, may be deposited, at the option of the owner, importer, or consignee, at his expense and risk, in any public warehouse owned or leased by the United States, or in the private warehouse of the importer, the same being used exclusively for the storage of warehoused goods of his own importation or to his consignment, or in a private warehouse used by the owner, occupant or lessee, as a general warehouse for the storage of warehoused goods, subject to the express conditions stated in the act, and such as are necessarily to be implied from other provisions. Such selected place of storage must be designated on the warehouse entry at the time of entering the merchandise at the custom-house.

But there are other and more material conditions expressly or impliedly annexed to the option given to the owner, importer, consignee, or agent, which it becomes important to notice. Warehouses for the deposit of imported goods are divided into two classes, public and private; but of the latter class there are two kinds, as already described. Importers, under that act, can have no option to deposit any importation in a public store unless such a store be owned or under lease by the United States, because one of the main purposes of the act was to discontinue the use of all such stores for warehousing, and to provide for the establishment of private bonded warehouses. Existing leases were to be cancelled at the shortest period of their termination, and new leases were forbidden at ports where there existed private bonded warehouses. Right of option, therefore, so far as public stores are concerned, must be considered as limited to cases where such stores were owned or under lease by the government. Conditions more express, however, in respect to the right of option to deposit imported goods in private warehouses, are to be found in the proviso annexed to the provision conferring the right. Stores must be first constituted private warehouses for the storage of ware-

housed goods within the meaning of the act, before any such option exists at all in respect to such stores.

Private warehouses, according to the first proviso of the section, must be used solely for the purpose of storing warehoused goods, and must have been previously approved as such by the secretary of the treasury, and have been placed in charge of a proper officer of the customs, who, together with the owner and proprietor, shall have the joint custody of all the merchandise stored in the warehouse; and all the labor on the goods so stored must be performed by the owner or proprietor under the supervision of the officer of the customs in charge of the same, at the expense of the owner or proprietor. Cellars and vaults of stores for the storage of wines and distilled spirits only, and yards for the storage of coal, mahogany, and other woods and lumber, may, at the discretion of the secretary of the treasury, be constituted bonded warehouses for the storage of such articles under the same regulations and conditions as are required in the storage of other merchandise; but the cellars or vaults must be exclusively appropriated to the storage of wines and distilled spirits, and have no opening or entrance, except from the street, and be under the separate locks of the custom-house and of the owner or proprietor.

Subject to these conditions and qualifications, the right of option undoubtedly is conferred by the act, but it is a mistake to suppose that it exists in the unrestricted and unqualified sense set up in the argument. Government had no public stores, except such as were already filled with imported merchandise; and in order to secure the right to deposit their importations in private warehouse; but the third section it necessary to comply with the conditions annexed to its enjoyment. Other differences exist between the act of the 6th of August, 1846, and that of the 28th of March, 1854, and one or two more of them may be profitably mentioned in connection with the question involved in this case.

Private warehouses might be agreed on between the collector and importer, under the former, subject only to the condition that the same should be kept under the joint locks of the custom-house and the importer, not in terms forbidding the use of the building for other purposes; but the latter expressly requires that private warehouses shall be used solely for the purpose of storing warehoused goods, and the application must not only have been previously approved by the department. but the store must be under the charge of a proper officer of the customs. Provision is wanting in the act of the 6th of August, 1846, to save the government harmless from risk, loss, or expense in keeping the importation in private warehouse; but the third section of the latter act provides, that before any store or cellar, owned or occupied by private individuals, shall be used as a warehouse for other merchandise, the owner, occupant, or lessee shall enter into bond exonerating and holding harmless the government and its officers from any such risk, loss, or expense.

Authority to establish, from time to time, such rules and regulations, not inconsistent with the laws of the United States, as he might deem to be expedient and necessary, was also conferred upon the secretary of the treasury by the ninth section of this act. Pursuant to that authority, additional regulations and forms were framed on the 2d of July, 1855, and promulgated on the same day, to give effect to the provisions of the several acts of congress establishing and extending the warehouse system. Some alteration is made in the classification of warehouses, under these regulations, which must be briefly noticed. Class one is stores owned by the United States, or hired by them prior to the date of the instructions, the leases of which have not yet expired or been cancelled. Classes two and three are the same as in the previous regulations, and need not be further noticed. Class four consists of yards and sheds of suitable construction, which, by the regulations, are allowed to be bonded in the manner prescribed for other depositories, and used for the storage of wood, coal, dye-woods, molasses, sugar in hogsheads and tierces, railroad, pig, and bar iron, chain cables, and other articles specially authorized. Bonded yards must be enclosed by substantial fences, with gates provided with suitable bars and other fastenings, so as to admit of being secured by customs locks, and must be used exclusively for the storage of the above-named goods. Sheds, also, must be provided with suitable fastenings, and be secured by the different and separate locks of the occupant and of the customs. Cellars and vaults of stores occupied for general business purposes may, under certain prescribed conditions, be used by the owner or lessee as bonded warehouses of class two, for the storage of wines and distilled spirits only and exclusively of his own importation. Neither stores, yards, sheds, cellars, nor vaults are private bonded warehouses, within the meaning of the act of congress, until they are constituted such by the sanction of the proper authorities.

Merchants or other persons desirous of having any building constituted a private bonded warehouse of the second or third class must apply to the collector of the port in writing, describing the premises, the location and capacity of the same, and setting forth the purpose for which the building is proposed to be used; as, whether for the storage of merchandise imported or consigned to himself exclusively, or for the general storage of merchandise in bond. Examination of the premises is then directed,

and a report of the particulars required to be made by the proper officers in writing. On the receipt of the report, it is the duty of the collector to transmit the same to the department, together with the application of the party, and certain required certificates, and a statement of his own views and opinion. Decision is then made by the secretary of the treasury, and, if the application is granted, the owner or occupant is then required to enter into a bond, of a prescribed form, in such penalty and with such security as the collector may deem proper. Applications for the bonding of yards and sheds as warehouses must be made in a similar manner, and under like regulations. Reg. July 2, 1855, p. 9. Express stipulation is contained in the prescribed form of the bond that the obligor will pay the salary of the officer in charge of the goods, or such part of the salary as may be required in pursuance of the regulations of the treasury department.

Merchandise in warehouse was covered by a bond, under the act of the 6th of August, 1846; but the place of deposit was only secured by the joint locks of the customs and of the owner or occupant, under the superintendence of the officer in charge. Places of deposit now, as well as the goods deposited, must also be covered by a bond, so that all such depositories, before the goods are placed within them, are in point of fact private bonded warehouses, as described in the act of congress. Foreign merchandise received into public stores is declared, by the act of the 3d of March, 1841, to be subject, as to the rates of storage, to regulations by the secretary of the treasury; but the charge on that account cannot exceed the usual rate at the port. 5 Stat. 432; Treas. Cir. & Dec. (Ogden) p. 132, § 35; Reg. July 2, 1855, p. 3; Foster v. Peaslee [Case No. 4,979]. Rate of storage allowed to be charged under the regulations of the 17th of February, 1849, for the privilege of warehouse in stores of classes two and three, and for the time of the inspector in superintendence, was a sum equivalent to the pay of such officer, or one half of the amount which would accrue as storage on the goods, if stored at regular rates in a public store. Other regulations and instructions upon the same general subject have been issued since those were promulgated.

Special reference is made by the plaintiffs to the regulations of the 2d of July, 1855, and they insist that the last-named regulations had the effect to repeal those that previously existed, so far, at least, as respects the rate of storage allowed to be charged in cases of this description. Direct repeal is not pretended; and the rule is, where there is no repealing clause, that the subsequent regulations only have the effect to repeal those previously existing, to the extent that those last issued are clearly repugnant to the former. Dwarris, Stat. 533; U. S. v. Walker,

22 How. [63 U. S.] 311. Half-storage, it is admitted, was a proper charge, under the regulations of the 17th of February, 1849; and the admission is a very proper one, because the regulations expressly require the importer, before he can use his own store for such deposit, not only to request such use, but also to indorse on the entry an agreement to pay the collector an amount equal to the salary of the inspector, or one half storage, and the importer was required to make his election in advance. Under the regulations of the 2d of July, 1855, the provision for store class two is, that for the time of the customs officer necessarily required in attendance at such store, the proprietor shall pay monthly to the collector of the port a sum equivalent to the pay of such officer, but the alternative provision for the payment of half-storage is dropped. Unexplained and separated from the other regulations in pari materia, the provision would seem to imply that in all cases the collector must in all cases exact a sum equal to the full salary of the officer in charge, which, in most conceivable cases, would be much greater than half-storage. That provision is made more stringent in the regulations of the 1st of February, 1857, which provide that the proprietor shall pay monthly to the collector of the port such sum as he (the collector) may deem proper for the service, not less, however, than the pay of such officer. Gen. Reg. p. 211. Appropriate expenses were authorized to be charged, and required to be paid, under the act of the 6th of August, 1846; but the charge is described in the regulations of the 17th of February, 1849, as one "for the privilege" and for the "time of the customs officer necessarily employed in attendance at such store." Goods duly entered for warehousing under bond may, according to the act of the 28th of March, 1854, continue in warehouse without the payment of duties, for a period of three years, and may be withdrawn for consumption on due entry and payment of the duties and charges, or upon entry for exportation within the same period, without the payment of duties; and the provision is, that in the latter case the goods shall be subject only to the payment of such storage and charges as may be due thereon.

Storage and charges, therefore, are the words of the last-named act, but the language of the regulations is, "for the time of the customs officer necessarily required in attendance at such store." Those regulations, however, expressly recognize half-storage as a proper charge in cases where liberty is granted to the importer after entry to take the whole or any part of the goods from the vessel by paying the duties on a withdrawal entry for consumption. Payment of one half storage for one month is expressly required under those circumstances, and the same regulations provide that charges for storage, labor, and other expenses, accruing on the goods, shall not exceed the regular rates for

such objects at the port. Unless the charges for storage can be allowed to exceed the regular rates at the port, it is difficult to see how an arbitrary rule requiring the collector to exact in all cases a sum equal to the full salary of the officer in charge could be sustained. One officer, under the regulations first issued, might have as many cellars in charge as in the judgment of the collector he could superintend efficiently, not exceeding six, and the same provision is retained in the subsequent regulations in the same words. Stores of class three were expressly excluded from that rule under the first regulations, and the prohibition was retained in those subsequently adopted, and made to include classes three and four. Class two was not within the prohibition, but the regulations of 1855 provided that, where one officer had charge of more than one warehouse of the second class, or more than one cellar or vault, the amount to be contributed by each must be agreed on by the owners or occupants and the collector. Authority to make such agreements was not conferred by the regulations of 1849, and the provision was changed in those of 1857, so that the amount to be contributed by each must be determined by the collector; and an agreement in writing must be made in all cases for the payment of the compensation of the officer.

Collectors are authorized to accede to these arrangements when the circumstances render the arrangements reasonably practicable, and the public interest will not be prejudiced by it; but it is necessarily in their discretion to determine those preliminary inquiries.

Comparing the acts of congress touching the matter in question, and the several regulations upon the same subject, one with another, it is quite obvious that the several provisions were all intended to accomplish the same general purpose. Warehoused merchandise is required to be kept by the government, and the keeping involves appropriate expenses, and the object of those provisions was to supply the means to defray those expenses and save the government harmless. Differences of phraseology undoubtedly are noticeable; but those differences have respect to matters of detail, and not of principle or substance. Importers, under the first regulations had, in express terms, an election whether to pay a sum equivalent to the salary of the officer in charge, or one half storage at regular rates, in the public stores; and, taken as a whole, I am of the opinion that the subsequent regulations do not repeal that provision. Expressions are certainly to be found in the subsequent regulations which, if taken separately, would strongly support the view that collectors are required in all cases to exact an amount equivalent to the salary of the officer in charge; but it is not possible to support the regulations at all, if that be their proper construction, for two reasons. Regarding the charge as storage and as an arbitrary exaction, then it would be contrary to law, because in most cases it would exceed the regular rates at the port; but if regarded as payment of the salary of the officer in charge, then the officer receiving it would incur a penalty of two hundred dollars. 1 Stat. 680. Difficulties so formidable cannot be overcome, and consequently the construction assumed by the plaintiffs must be rejected. Where the interpretation of the revenue laws and regulations are involved, considerable weight should be given to the practice of the government as a contemporaneous construction of the provision under consideration When the subsequent regulations were issued, the practice was not changed, but continued the same; and, as a general remark, it may be said that it has never been changed to the present time. Full confirmation of the last remark, if any be needed, is found in the abstract of decisions forwarded to the collectors of the customs on the 30th of June, 1857, by the secretary of the treasury. On that day certain additional instructions were issued to the collectors, and the secretary took occasion to subjoin an abstract of decisions on questions under existing revenue laws. Among the abstract of decisions is one in respect to "storage in private stores"; and the instructions say, "It has been decided that, in cases where goods are stored under bond in a private store, the importer shall either make monthly payment of a sum equivalent to the pay of an inspector placed in charge of the same, or one half of the amount which would accrue as storage on the goods so stored if placed in public store, the importer to make his selection at the time of placing the goods in store." All of the collectors, it is believed, have conformed to that decision since it was made, and, in view of all the provisions upon the subject, it is difficult to see what other rule can consistently be adopted, except when the arrangement is made for one officer to have charge of more than one warehouse, as before explained. Warehouse Manual (Bruce) p. 205.

Several grounds are assumed by the plaintiffs to show their right to recover, but it is clear, from the explanations already given, that none of them can be sustained. 1. They insist that, under the act of the 28th of March, 1854, they had a right to elect to deposit the importations in question in their own store, and that they were virtually deprived of that right by being compelled to accept the condition to pay half-storage to secure the enjoyment of the right. Sufficient answer to this complaint has already been made in the previous explanations. Government had no public stores which were not full, and the plaintiffs had to comply with the regulations in order that their own stores might be constituted "private bonded warehouses." Election was made by them, and they have enjoyed the right, and, in the language of the law, must pay the appropriate expenses. 2. In the second place, they deny

that there were any expenses, but the error of this assumption has already been shown, and the explanations need not be repeated. 3. Lastly, they insist that, if the collector had a right to demand anything, it was a sum equivalent to the salary of the officer in charge, and not half-storage, and that no such demand was ever made. Half-storage, it is admitted, is much less than the salary of the officer, but the proposition is, that half-storage could not be exacted under the regulations; and, although the collector might have demanded a much larger sum, still, as the sum received could not be legally exacted in that form, they have a right to recover it back in an action for money had and received. After full consideration, I am of the opinion that no part of the proposition can be sustained. Half-storage was properly demanded under the regulations; but if the collector accepted a less sum than he was entitled to receive, the plaintiffs in this form of action could not recover it back merely because the sum paid was characterized by a wrong name. In view of the whole case, I am of the opinion that the plaintiffs are not entitled to recover; and, under the agreement, and notwithstanding the verdict, there must be judgment for the defendant.