UNITED STATES *v.* DE VISSER, Ex'x, etc.

SAME *v.* TURNURE.

*(District Court, S. D. New York. February 20, 1882.)*

1. CUSTOMS DUTIES—WAREHOUSE BONDS—RIGHTS AND LIABILITIES OF SURETIES.
    Sureties in warehouse bonds given to the United States, under section 2964 of the Revised Statutes, have the same rights and liabilities as ordinary sureties, except as modified by the special laws and regulations concerning the collection of revenue.

2. WAREHOUSE BONDS, HOW INTERPRETED.
    Warehouse bonds must be interpreted in reference to the statutes and authorized regulations in force belonging to the warehouse system, and in so far as by design or necessary effect they modify the ordinary rights of the sureties, they are controlling, and to this extent must be regarded as parts of the contract of suretyship.

3. SAME—STATUTES, HOW CONSTRUED.
    Statutes not designed to affect the rights and liabilities of third parties, but only to guide the officers of the government in the performance of their duties, are to be construed as directory to them only, and as not creating any obligation to sureties, or forming any part of their contract.

4. SAME—SALE OF ABANDONED GOODS.
    The provision in the act of August 5, 1861, (12 St. at Large, p. 293, § 5; section 2971, Rev. St.,) that warehoused goods, not withdrawn within three years, "shall be deemed abandoned to the government and sold," etc., was not designed merely for the security of the government, and to recover its duties in the particular case, but to secure in all cases, so far as possible, the prompt payment of duties within three years, and for this end to cut off peremptorily, after that period, the right of any person to pay the duties and withdraw the goods. Until the amendment of July 28, 1866, (14 St. at Large, p. 230, § 10,) the policy thus enacted involved a forfeiture of any surplus value from the sale. The sale of the goods by the government, as directed, is an incident of the abandonment declared by the act, and an inseparable part of the proceeding.

**5. SURETY—RIGHTS DEFINED.**

A surety's ordinary right to pay the debt and take possession of the goods at the end of three years, is, therefore, cut off by the act, and his right to pay any deficit, and proceed for indemnity against his principal, is also suspended until after the sale.

**6. REMEDY BY SUIT UPON THE BOND.**

The proceeding by abandonment and sale is a substitute for the ordinary remedy upon the bond after the lapse of three years. Immediate suit by the government upon the bond, before sale, would involve such inconsistencies that the common-law remedy must be deemed suspended by necessary implication until after the sale of the goods.

**7. RIGHT OF PAYMENT AND SUBROGATION—WHEN CUT OFF.**

Until after such sale the surety in a warehouse bond has at no time any right of payment, of subrogation, or suit for indemnity against his principal, and his risk continues necessarily till that time. As the statute of 1861 forms in legal effect a part of the bond for the purpose of cutting off his ordinary right of payment and subrogation, and of terminating his risk at the end of three years, it must also be held to form a part of the contract for the purpose of fixing the time when the suspension of his ordinary rights shall cease.

**8. CONTRACTS OF SURETIES, HOW INTERPRETED.**

Contracts of sureties are interpreted *strictissimi juris* as respects the subject-matter or the duration of their risk, and any change in either, without the sureties' assent, operates as a discharge.

**9. SALE OF ABANDONED GOODS.**

The statute of 1861 directing a sale according to the prescribed regulations of the treasury department, the regulations so established providing for quarterly sales, and the sale of the abandoned goods at the next sale after three years, are all material parts of the surety's contract, because they fix and determine the duration of his risk.

**10. SAME—POSTPONEMENT—SURETY DISCHARGED.**

Where, upon such goods being advertised for sale at a regular quarter-day, pursuant to the statute and regulations, the secretary of the treasury, at the request of a purchaser of the goods in bond, intervened by order, and directing a postponement of the sale until further orders without the surety's consent, *held*, that the latter was discharged. *Semble* mere delay by the officers of the government in selling as directed would not discharge a surety, the government not being answerable for mere laches of its officers.

**11. SAME—EFFECT OF MERE DELAY.**

Mere delay by a creditor in disposing of his securities, unless specially requested by the surety to proceed, is no defence; if so requested, it is a defence only to the extent of the damages proved.

**12. SAME—IMPORTER NOT DISCHARGED BY POSTPONEMENT.**

The importer being liable as principal, and not being in the situation of a surety having a right of indemnity against any other principal, *held* not discharged by the postponement of the sale.

*S. L. Woodford* and *W. C. Wallace*, for plaintiff.

*S. A. Blatchford* and *Dudley Phelps*, for defendants.

BROWN, D. J. The above actions are brought to recover duties upon a warehouse bond executed on June 26, 1871, by Simon De Visser, as principal, and L. Turnure, as surety. The bond recites

that the principal had on that day entered at the port of New York 100 bales of imported cinnamon, under the laws of the United States providing for the warehousing of merchandise in bond, and was conditional that the bond should be void "if within one year the goods should be lawfully and regularly withdrawn on payment of duties and charges, or if, after one year, and within three years, they should be withdrawn on like payment, with 10 per cent. additional, or if within three years they should be so withdrawn for actual export beyond the United States; otherwise to remain in full force."

The cinnamon, consisting of 9,364 pounds, was imported by De Visser for Townsend, Clinch & Dyke. It was sold to them in bond at 10 cents per pound; was transferred to them shortly after importation, and a memorandum thereof made on June 21, 1871, upon the withdrawal ledger of the custom-house.

None of the cinnamon having been withdrawn, nor any of the duties paid, the goods were advertised for sale by the collector on the nineteenth of July, 1876, as "abandoned goods." This sale was postponed by the collector, without the knowledge or consent of the defendants, upon the receipt of the following letter from the secretary of the treasury:

"TREASURY DEPARTMENT,
"WASHINGTON, D. C., July 18, 1876.

*"Collector of Customs, New York*—SIR: Mr. Solomon Townsend, representing the late firm (in liquidation) of Townsend, Clinch & Dyke, has made personal application to the department for leave to export certain 100 bales cinnamon, marked 'C. J.,' which appear upon the catalogue of goods to be sold by your order on the 19th inst., as lot No. 254.

"The department declines at present to entertain the said application, but, upon the further request of Mr. Townsend, hereby authorizes and directs you to withdraw said lot from sale, and to retain the same in your custody until further advised by the department, provided the interests of the government will not be prejudiced thereby.

"It is understood by the department that the continued possession of the goods, together with security offered by the bond given on the warehouse entry, will be amply sufficient to protect the government from loss by reason of the temporary withdrawal of said cinnamon from public sale, as hereby authorized.

"Please report to the department your action in the premises.

"Respectfully,          LOT M. MORRILL, Secretary."

The cinnamon was thereafter sold by the collector at a similar sale on October 17, 1877, realizing $573.50. The duties, at the rate of 20 cents per pound and 10 per cent. *ad valorem*, were liquidated on August 3, 1871, at $1,935.90, which, after adding penalty and

charges, and deducting the sum realized on the sale, would leave a deficiency, including interest to this date, of $2,332.25, for which sum the plaintiff asks judgment.

By the act of August 6, 1846, (9 St. at Large, 53,) it is provided that goods so warehoused shall "be kept with due and reasonable care, at the charge and risk of the owner, importer, etc., and subject at all times to their order, upon payment of the proper duties and expenses," etc.

By act of July 14, 1862, (12 St. at Large, p. 560, § 21,) as amended by act of July 28, 1866, (14 St. at Large, 330; Rev. St. §§ 2971-2,) it is provided that all goods remaining in warehouse beyond three years shall be regarded "as abandoned to the government, and shall be sold under such regulations as the secretary of the treasury may prescribe;" and that, "after deducting duties, charges, and expenses, any surplus may be paid to the owner." Article 138 of the regulations of 1868, and article 764 of 1874, provide that such surplus *must* be paid to the owner, etc. See *Supervisors* v. *U. S.* 4 Wall. 435, 445-7.

By article 134 of the treasury regulations issued October 30, 1868, it is provided that "goods duly bonded, remaining in warehouse without payment of duties for the space of three years from importation, must be in the same manner sold at the first quarterly sale thereafter, distant not less than three weeks."

By article 135, quarterly sales are directed to be had between the first and tenth of each January, April, July, and October. Article 136 contains directions for an appraisal of the goods before sale, and many minute particulars to be observed in regard to cataloguing and advertising the property to be sold. These provisions were in force when the bond in suit was executed; and similar provisions are found in articles 761 and 762 of the regulations issued January 1, 1874, under which the sale in 1877 was made, and many of them are now incorporated in section 2973 of the Revised Statutes, and in previous laws.

The defendants claim that the bond given by them is to be construed in reference to these provisions of the statutes and treasury regulations; that upon the sale of the goods by De Visser to Townsend, Clinch & Dyke, and notice thereof to the government, De Visser became, like Turnure, but a mere surety for the payment of the duties; and that by the postponement of the sale by order of the secretary of the treasury, in July, 1876, the government, in legal effect, released the sureties and elected to look to the goods for payment, and that the defendants were thereby discharged.

Aside from the statute providing that the goods "shall be deemed abandoned to the government and sold" after three years, (section 2971,) it is manifest that the delay and postponement of the sale constitute no ground of defence; for, apart from this statute, the case would be simply that of delay by a creditor in enforcing his remedy upon collateral securities, and this, it is well settled, is no defence to a surety, since he has had, during all the period of delay, the legal right, if he choose, to pay the debt, and take and enforce the securities himself. Unless, therefore, he has previously intervened, and given distinct notice requiring an immediate resort to such securities, he has no cause of complaint; if he has done that, and any subsequent loss arises through neglect to proceed, that will be a defence *pro tanto* only to the extent of the damages proved. *King* v. *Baldwin,* 2 Johns. Ch. 559; *Schroeppell* v. *Shaw,* 3 Comst. 457; *Clark* v. *Sickler,* 64 N. Y. 231; *Hunt* v. *Purdy,* 82 N. Y. 486; *Black River Bank* v. *Page,* 44 N. Y. 453; *Remsen* v. *Beekman,* 25 N. Y. 552. In this case there was no proof of any notice or request to sell, nor of any special damage arising from the delay.

The defence rests wholly, therefore, upon the provision of the statute of 1861 which declares that after three years the goods, if not withdrawn, "shall be deemed abandoned to the government, and shall be sold under such regulations as the secretary of the treasury shall prescribe." In this case the goods were not "sold" in accordance with the "regulations prescribed," nor until several years afterwards; and one of the causes of delay was a postponement specially ordered by the secretary of the treasury.

The questions involved are whether this statute, and the regulations under it, formed by implication of law any part of this bond; and if so, whether the postponement of the sale by special order of the secretary of the treasury beyond the time provided by the statute and regulations involved any such alteration of the implied terms of the contract as to discharge the surety. For it is only in consequence of some alteration in the express or implied terms of the contract, in an essential particular, that the surety can claim to be discharged; and if the postponement of the sale in this case had no bearing upon the extent or duration of the surety's risk, and no other result than mere delay in realizing upon the goods held as security for the duties and charges, then the postponement would not constitute any defence to the surety, any more than it would in the absence of any statute on the subject.

In examining these questions it is assumed that the ordinary principles of the law of principal and surety apply to this case. If there is anything peculiar in the situation of custom-house sureties, or in the law applicable to them, it must result from the form of the bonds themselves, or from the special laws designed to affect the rights and liabilities of the parties to them. The bond in suit was given under the provision of the statute now embodied in section 2964 of the Revised Statutes, which provides that goods may be entered for warehousing, "subject to order, on payment of the proper duties and expenses, to be secured by a bond, with *surety* to the satisfaction of the collector, in double the amount of the duties, in such form as the secretary of the treasury shall prescribe." Different forms of these bonds have been prescribed from time to time. The present was the form in use at the time it bears date. Treas. Reg. art. 31 of 1868. Though having several alternative conditions, it is in substance a bond for the payment of duties and charges, unless the goods shall be duly exported within three years; and, upon forfeiture, only the amount of duties and charges could be collected upon it. *Westray* v. *U. S.* 18 Wall. 330.

The statute, in requiring a "surety," requires only an obligor having the rights and liabilities of any ordinary surety, except in so far as they are modified by the special laws and regulations applicable to the subject. Except as thus modified, the rights of sureties in such bonds given to the government are the same, and are governed by the same rules of law that pertain to contracts of suretyship between individuals. "There is not one law for the former and another law for the latter." Per *Swayne*, J., *McKnight* v. *U. S.* 98 U. S. 186. The inquiry in any such case must be, what are the general rules of law applicable to the particular contract, and to what extent, if at all, have these rules been modified by the special laws and regulations concerning the collection of the revenue?

1. In considering the statute of 1861, declaring that after three years goods not withdrawn "shall be deemed abandoned to the government and sold," the first inquiry is whether this statute is to be deemed to be in effect any part of the bond, or to create any obligation of the government to the surety; or whether it is simply directory to the officers of the government, in the nature of private instructions from a principal to his agent, designed only for the latter's guidance in the performance of his duties.

This statute, together with the regulations above recited, form a part of the system of laws regulating the entry of goods for ware-

housing, and these laws are referred to in general terms in the bond itself. The bond cannot in fact be understood or applied without a reference to these laws. As above observed, it is not even conditioned, in express terms, for the payment of duties, although that is its legal effect, but only for "withdrawal of the goods upon payment of duties," etc. Being given under the provisions of law establishing the warehouse system, the bond must be interpreted in reference to the statutes and regulations in force concerning that system; and in so far as any of such statutes, either by design or necessary effect, are found to modify the ordinary rights of suretyship in a bond like the present, they are controlling, and must be held to modify those rights accordingly. 2 Story, Const. (3d Ed.) 232; *U. S.* v. *Kirkpatrick,* 9 Wheat. 720, 734; *People* v. *Pennock,* 60 N. Y. 421, 426. In this sense, and to this extent, statutes and regulations which are designed to affect the rights of parties to the contract must be regarded as parts of the contract, otherwise the statute would be *pro tanto* annulled. In the case last cited it is said, per *Allen,* J., (p. 426:) "The condition of the bond must be construed, and the liabilities of the sureties limited, in reference to the statutes making the supervisor a custodian of public moneys. These statutes make a part of the contract of the surety."

But, on the other hand, statutes which are not designed to affect the rights or liabilities of third parties, but are designed only to direct the officers of the government in the performance of their duties for its own protection and security merely, are construed as directory to them only, and as not creating any obligation to the surety in the bond, nor as forming any part of the contract of the government with him. *U. S.* v. *Kirkpatrick,* 9 Wheat. 720, 736; *U. S.* v. *Van Zandt,* 11 Wheat. 184; *U. S.* v. *Nicholl,* 12 Wheat. 505, 509; *Locke* v. *Postmaster Gen.* 3 Mason, 446, 450; *Dox* v. *Postmaster Gen.* 1 Pet. 318, 325; *U. S.* v. *Boyd,* 15 Pet. 187, 208; *Jones* v. *U. S.* 18 Wall. 662; *Osborne* v. *U. S.* 19 Wall. 577, 580; *Board of Sup'rs* v. *Otis,* 62 N. Y. 88, 93, 95. These cases are all of them cases against sureties upon bonds given for the faithful performance of their duties by collectors, postmasters, or other receivers of public moneys, who were required by law to render certain periodical accounts, upon which suits might be brought for any deficiencies, and in some of the cases the officers were directed to be removed. In the leading case on the subject, *U. S.* v. *Kirkpatrick,* 9 Wheat. 720, *Story,* J., says: "These provisions of the law are created by the government for its own security and protection, and to regulate the conduct of its officers. They are merely directory to such officers, and constitute no part of the contract with

the surety," and therefore it is held that any laches of the government officers in the performance of such directory duties is no defence to a surety, since it does not violate any duty owed to him, or any of the implied terms of the contract with him. And this is the principle of all that class of cases.

But if the statute of 1861 was not designed to be merely a direction to the government officers, but was designed directly to affect, or by its operation does necessarily directly operate upon and affect, the rights of the sureties in warehouse bonds, then it cannot be held to be merely directory, like those in the cases last cited, but must form, by implication of law, a part of the contract; since otherwise the statute would be rendered nugatory. That such is the intention and the necessary effect of the statute of 1861 seems to me to be clear from the language of the act, and from the presumed intention of it to be gathered from the various statutes on the subject, and from a consideration of what would be the rights of the parties in the absence of any similar statutory provisions.

Aside from any statutory provisions of this character, the bond in question, upon the lapse of three years without withdrawal of the goods and payment of the duties, would be forfeited, and an action at law would at once lie upon it against the principal and surety, without reference to the goods still in the possession of the government. The latter would also have the right, at its election, to proceed first to realize what it might from a sale of the goods, on due notice to the parties interested, paying the surplus, if any, to the owner; and if a deficiency resulted, to recover such deficiency afterwards by action upon the bond. In either case the principal would have a legal right to pay the debt, *i. e.*, the duties and charges, at any time after three years, and before a sale of the goods, and at the same time take the goods into his possession; and the surety also, at any time before payment by the principal, would have the same right to pay the debt, and be subrogated to all the rights of the United States to the goods in its possession, and to its right of action against the principal; and this right, between individuals, could be enforced by suit. These are familiar principles in the law of suretyship. *Johnson* v. *Zink,* 51 N. Y. 336; *Hayes* v. *Ward,* 4 Johns. Ch. 123, 131; *Marsh* v. *Pike,* 10 Paige, 595. Hence, if there was no statutory provision of this kind, the time for the payment of duties on all warehouse goods would be practically considerably enlarged, since payment of duties could always be safely deferred until the government was ready to effect a sale. To avoid this practical extension

of the period for payment of duties, and to secure prompt payment within the time intended to be limited by the warehouse acts, some provision of this kind was necessary. Moreover, the handling of the vast amount of warehoused goods, the orderly collection of the duties upon them through the proper subordinate officers, and the necessity of a transfer of the goods to different hands for the purpose of a government sale,—in other words, the conveniencies of the public business,—also required that a period be fixed when the importer's right to pay the duties and to control the goods should cease, and when the government might proceed to sell without inconvenience and without question. The various acts passed since the adoption of the warehouse system show, I think, that the purpose of the statute in question was not only for convenience in the transaction of the public business, but especially, also, to secure the prompt payment of duties within the prescribed period.

The act of August 6, 1846, (9 St. at Large, 53,) establishing the warehouse system, allowed but one year for the payment of duties, or for re-exportation without payment; and it provided that in case any goods should remain in public store beyond *one* year without payment, they should be sold by the collector, "on due public notice given in the manner and for the time prescribed by the general regulations of the treasury department, and the proceeds of such sale, after deducting storage, charges, expenses, and duties, should be paid over to the owner, importer, consignee, or agent." These regulations applied alike to goods deposited in public store for want of due entry, and to those entered for warehouse under the act. By act of March 3, 1849, (9 St. at Large, p. 399, § 5,) a period of two years was allowed for exportation. By the act of March 28, 1854, (10 St. at Large, p. 271, § 4,) it is provided that "all goods entered for warehousing under bond may continue in warehouse, after payment of duties thereupon, for a period of *three* years from the date of original importation, and may be withdrawn for consumption on due entry and payment of the duties and charges, or, upon entry for exportation, without the payment of duties, at any time within the period aforesaid; in the latter case the goods to be subject only to the payment of such storage and charges as may be due thereon." By the act of August 5, 1861, (12 St. at Large, p. 293, § 5,) it is provided that "all goods thereafter deposited in bonded warehouse, if designed for consumption in the United States, must be withdrawn, or the duties paid, within *three months* after the same are deposited," or "within *two years,* upon payment of the duties, with 25 per cent. additional," or

may be withdrawn for exportation at any time before the expiration of three years; "*such goods, if not withdrawn in three years, to be regarded as abandoned to the government, and sold under such regulations as the secretary of the treasury may prescribe, and the proceeds paid into the treasury.*" This is the first enactment of the specific provision here considered. By the act of July 14, 1862, (12 St. at Large, p. 560, § 21,) it was provided that goods "thereafter deposited in bonded warehouse must be withrawn or the duties paid within *one* year," or withdrawn for exportation within three years, and that "any goods remaining in public store or bonded warehouse beyond *three* years shall be regarded as abandoned to the government, and sold under such regulations as the secretary of the treasury may prescribe, and the proceeds paid into the treasury." By the act of July 28, 1866, (14 St. at Large, p. 330, § 10,) the last provision of the act just quoted was "*amended* so as to authorize the secretary of the treasury, in case of any sale under the said provision, to pay to the owner, consignee, or agent of such goods the proceeds thereof, after deducting duties, charges, and expenses, in conformity with section 1 of the act of August 6, 1846," above referred to; and by act of March 14, 1866, (14 St. at Large, p. 8, § 1,) it was provided that "goods may be withdrawn for consumption until the expiration of *three* years, on payment of the duties and charges, and 10 per cent. additional." These last provisions are embodied in substance in sections 2971, 2972, 2973, of the Revised Statutes.

From this review of the various acts upon this subject it will be seen that by the statute of 1861, which first enacted the provision in question, the abandonment of the goods to the United States was made complete for all purposes, if not withdrawn within three years; so that, upon a sale of them by the government, the owner had no longer any right even to the surplus, which had been previously secured to him by the act of 1846. By the act of 1866 this right of the owner to the surplus was restored; but the provisions for abandonment and sale were, in other respects, unchanged.

It cannot be doubted, I think, that one of the purposes of the act of 1861 was to secure the payment of the customs dues within three years, by making it for the owner's interest to pay the duties within that period. To secure this end, in the case of all warehoused goods, it was designed by this enactment to cut off peremptorily, after the lapse of that time, the right of any person, whether importer or owner or surety, to pay the duties and withdraw the goods. If such a design was partially indicated by the general provisions for sales

in the act of 1846, it was made more certain and emphatic by the act of 1861, which declared that the goods should, after three years, be deemed "abandoned to the government," and worked a forfeiture of any surplus. That act was passed amid the exigencies of the war; and the general purpose of the act to insure the prompt payment of duties is shown by other provisions of the same section of the act, which reduce the time for the payment of duties, without penalty, to three months, and add thereafter an increased penalty of 25 per cent.

The act must, therefore, be held to have been designed to cut off the right of the surety as well as of the principal, which they would have had but for some statutory provisions of this kind, to pay the duties and withdraw the goods after the lapse of three years, and at any time before a sale. It has been so construed in the regulations of the department, and such, I think, must be held to be its proper legal effect. Article 141 of 1868, and article 767 of 1874, of the treasury regulations, forbidding such withdrawal, are based upon this view of the statute. To this extent, therefore, the statute of 1861 enters into and forms a part of the implied terms of this bond. It cuts off the surety's right of payment and subrogation, which, but for some statutory provisions of this character, he would have had.

The statute cannot, therefore, be held to be a merely directory one, like that referred to in the case of *U. S.* v. *Kirkpatrick,* and others of a kindred character, above cited, which is addressed to the officers of the government merely for their own guidance in the performance of their duties. It is more than that, because it is designed to cut off, and does cut off, the surety's rights of payment and subrogation, which are ordinarily incident to his very contract of suretyship. It was not designed to provide for a sale of the goods merely for the security of the government, and merely to recover its claims in the particular case of any goods being left over after three years; for the government had that right already without this statute, under the act of 1846; and, if that were the only design of the act of 1861, the provision that the goods "shall be deemed abandoned to the government" would have been neither necessary nor appropriate, and on such a construction the statute would in effect become mere surplusage, of no use or effect. Its purpose was rather to prevent, so far as possible, any goods being left over at all, by enacting such a policy in regard to them as should induce all importers to withdraw their goods within the prescribed period; and for this purpose the power of every person to withdraw the goods upon

payment of the duties was intended to be cut off immediately after the lapse of three years, and until 1866 any surplus value was forfeited to the government.

The tendency and effect of this statute, enforced according to this construction, which involves some loss to the owner at best, through a sale of his goods under unfavorable circumstances, has undoubtedly been to secure payment of duties within three years on the vast majority of warehouse entries. It is of more consequence to the government to secure this general result, than to obtain a somewhat earlier payment of duties on the few goods which, under this policy, are still left over after three years, which might be obtained by consenting to their withdrawal on payment of duties before actual sale; and such a right of withdrawal on payment after three years, was, therefore, intended to be prohibited by this act.

2. The statute of 1861, prior to the amendment of 1866, was thus to some extent punitive. Though the forfeiture of any excess upon a sale is now remitted, the general purpose of the act cannot be deemed thereby changed, or its effect in cutting off the right of withdrawal after three years, on payment of duties by either principal or surety, repealed. These must remain the same.

The necessary logical and practical result of the enforcement of these provisions must be that the government's right of action upon the bond is suspended until the sale of the goods. If such a suit could be brought before sale the importer or surety, on being sued, might pay at once; and, in that case, the goods would not be sold, and the "proceeds applied to the payment of the duties, charges, and expenses," as provided by the act of 1866. This is, perhaps, rather a verbal than a substantial criticism. But it is certainly contrary to the intent of this act that the government should sue for and collect the duties, and still keep the goods; nor, after collecting the whole duty by suit, could it then deliver up the goods to the owner without violating the very purpose, policy, and object of the statute in declaring that the goods should be "deemed abandoned and sold." If that could be done, the payment on suit would become merely a mode of withdrawal of the goods by the owner after three years, which is prohibited. Nor, prior to the amendment of 1866, (when there was no provision for returning to the owner any surplus, or even any proceeds of the sale, if the duties were collected first,) can it be supposed that it was the intent of the act that the duties might first be collected in full by suit on the bond, and that then a double payment, either wholly or in part, might be exacted through a sale of the

goods by the government for its own benefit, and without any returns to the owner.

There is no reasonable alternative, therefore, but to hold either that the goods may be withdrawn on payment of duties after three years at any time before sale, which would seem to be directly contrary to the provisions of the statutes, and which would revolutionize the practice of the department, or else that this right is designed to be absolutely prohibited by the act of 1861, as a matter of policy for the general interests of the government, and that, as a consequence therefrom, the right of suit on the bond is necessarily suspended until after a sale of the goods. The latter construction is, I think, the only one consistent with the language of the statute, and with its apparent intent, as shown by the several acts on the subject above quoted.

The provision for the sale of the goods, moreover, cannot be separated from the clause declaring them "abandoned to the government." The sale directed by the statute is evidently designed to be associated with, and consequent upon, the abandonment previously declared. It is, therefore, a part of the statutory proceeding adjudging the abandonment of the goods; and the ordinary rights of either party incompatible with the course of procedure so enacted, including any subsequent payment, or withdrawal of the goods, or suit by the government before sale, must be deemed superseded by it.

The case is analogous to that of *Looney* v. *Hughes*, 26 N. Y. 514, where suit was brought against the sureties of a town tax collector, upon a bond conditioned generally for the faithful performance of his duties. A statute required the county treasurer to issue a warrant to the sheriff to collect from the collector any deficiency in his returns; and, if uncollected, to report to the supervisors the amount remaining due, who were ordered by statute forthwith to put the bond in suit and to recover the sum due. *Selden*, J., says, (p. 517,) that upon these statutory provisions "a recovery upon the bond according to the rule of the common law" (*i. e.*, by suit immediately on the collector's default) "appears inadmissible." "Can an action be commenced to recover this sum before the amount is ascertained, or before it is ascertained that any sum whatever will remain uncollected? I think, clearly not. * * * The same instrument can hardly bear two different constructions, and be subject to two different rules of damages for the same identical breach. It would seem, therefore, that no action could be maintained upon the bond until after the issue and return of the warrant authorized by section 13."

The effect, therefore, of the statute of 1861 is to provide a mode of procedure as to goods not withdrawn within three years, which shall be a substitute for the ordinary course of proceeding by either party upon default in the condition of a warehouse bond like the present. The statute prescribing this substituted procedure applies as though it formed a part of the bond, and this substitute is exclusive of any other proceeding, so long as there are goods remaining unsold, because any other course would require acts either directly contrary to the "abandonment" declared, or would involve inconsistencies and incongruities which seem clearly inadmissible. The common-law remedy is, therefore, suspended until after the sale by the "necessary implication" of the statute of 1861, and the case is within the exception to the ordinary rule of construction that a statutory remedy is to be deemed cumulative only, "unless the common-law remedy is negatived in terms or by necessary implication." 2 Inst. 200; *Crittenden* v. *Wilson*, 5 Cow. 165; *Clark* v. *Brown*, 18 Wend. 220; *Stafford* v. *Ingersol*, 3 Hill, (N. Y.) 41; *Dudley* v. *Mayhew*, 3 N. Y. 9. It is as though the parties had stipulated in the bond that, in case of default, their remedies, if goods remained on hand, should be first sought in this way, and in no other; the right of action on the part of the government being thereby suspended until sale, and the right of payment and subrogation by the surety to the possession of the goods being also cut off. The surety's obligation becomes, in effect, as in the case of *Looney* v. *Hughes,* an obligation to make good any deficiency that may arise upon a sale to be had in pursuance of the statute; and such, also, is the provision of the treasury regulations, (article 138 of 1868; article 764 of 1874,) which direct that from the proceeds of sale shall be paid the duties, charges, expenses, etc., and that "the balance will be collected upon the warehouse bond by suit, if necessary;" and it is for such a deficiency that this suit has been brought.

3. The result is that under this statute of 1861 the surety has no right of subrogation, and can neither pay the debt nor resort to his principal for indemnity until after the sale has been had as provided by the statute. He could not discharge the debt and withdraw the goods during the three years, because the express term of credit to the importer or his vendee lasted for that whole period. Under this statute, and the regulations issued in pursuance of it, he could not do so at any time after the three years and before the sale, because immediately upon the lapse of the three years the statute comes in and declares that the goods "shall be deemed abandoned and sold."

Until after the sale, therefore, there is never a moment when the surety has any power to do anything for his own protection, either by payment, subrogation, or suit against his principal. His risk, therefore, necessarily continues up to that time. It is the sale which first puts a period to his risk; until then his hands are tied, and he can take no steps against his principal for his indemnity.

In this point of view, therefore, the provision for the sale in the statute of 1861 becomes of vital importance to the surety, since it is that which determines the duration of his risk, and when it may be terminated. The surety is entitled to the benefit of the provision for the sale in terminating his risk, because it is a part of the same statute which enters by necessary implication into his contract, so as to cut off or suspend his ordinary right to end his liability by payment and subrogation immediately on the lapse of three years; and if the statute forms a part of the bond for this purpose, then it must also form a part of it for the purpose of fixing the time when this suspension of his ordinary rights shall cease. The same statutory provision cannot be both in the contract and out of it at the same time. The provision for the "sale" is an inseparable part of the provision for the abandonment of the goods to the government; and if the surety's ordinary rights to terminate his risk by payment and subrogation are cut off by the latter, he must be entitled to whatever protection, in limiting the duration of his risk, the clause providing for a sale may afford him; and this provision enures to his benefit as a part of the implied terms of the bond. The provision for a sale in this statute is, therefore, as much "an obligation owing directly to the surety" as the provision for an abandonment of the goods to the government is an enactment operating directly to defeat his ordinary rights. The postponement of the sale was, therefore, a violation of a duty owed to the surety under this bond, and involved a prolongation of his risk beyond the period contemplated by law and by the implied terms of his contract, upon the observance of which he had a legal right to rely.

Any different construction seems to me to be unreasonable, and to place sureties in a most anomalous position. Warehouse bonds with such sureties are now required by law (section 2964) to the amount of nearly $100,000,000 annually at this port alone. While requiring sureties to this vast extent, it seems scarcely reasonable to hold that the law was intended to cut off their ordinary right of self-protection through payment and subrogation at the end of three years, without any provision as a substitute upon which the sureties might

have a legal right to rely in fixing some time when their risk might be terminated. Nor can it be supposed that sureties would be required by law to enter into obligations to such a vast extent upon risks which might be unlimited in duration, and which they would never have any power to bring to a close. No prudent man could be expected to enter into such an obligation as surety for another; and no unnecessary construction of the statute should be given which would lead to that result. This statute, and the regulations under it, do, upon their face, provide approximately such a period for the termination of the surety's risk, by sales prescribed to be had not long after the lapse of the three years; and thereupon any further risk of sureties could be immediately terminated by payment of the debt, and suit against their principals. These provisions, while valuable to the government, afford also reasonable protection to sureties; they are such as sureties would naturally rely upon, and are such as I think the law designed to give them a right to rely upon as a part of their contract; so far, at least, as that the time of sale should not be deliberately postponed without their assent. If the sale may be indefinitely postponed at the option of the secretary of the treasury, and the surety be still held, then these provisions, in the language of the court in *U. S.* v. *Becker*, 21 Wall. 656, "instead of affording a limitation and a safeguard to the surety, might prove but a delusion and a snare, and subject him to liabilities which he could not have foreseen, and to the hazard of which he would not willingly have exposed himself."

I do not perceive any interest which the government can have in upholding such a power of indefinite postponement of sales. If it has any such interest it can be provided for among the regulations which the statute authorizes to be prescribed. When that is done, sureties will know what to expect if they enter into such obligations thereafter. Until then their risk cannot be thus indefinitely prolonged.

In this case the postponement was not apparently for any interest of the government, but was given as a favor to third persons, then owners of the goods, who had requested it of the secretary. Such a favor could not be granted at the expense of the surety, by prolonging his risk, without his assent.

A surety's contract is in this respect *strictissimi juris*. Any prolongation of his risk, or change in the subject-matter of it, is an alteration of the contract in an essential particular; and if made

without the surety's consent discharges him from liability; and this applies equally to the United States, and to any alterations of the contract made through the acts of its officers. *U. S.* v. *Hillegas,* 3 Wash. C. C. 70; *U. S.* v. *Tillotson,* 1 Paine, C. C. 305; *U. S.* v. *Boecker,* 21 Wall. 652; *Miller* v. *Stewart,* 9 Wheat. 681; *King* v. *Baldwin,* 2 Johns. Ch. 560; *Grant* v. *Smith,* 46 N. Y. 93; *U. S.* v. *Bostwick,* 94 U. S. 66; *Cooke* v. *U. S.* 91 U. S. 396.

If the secretary of the treasury had by express order, at the owner's request, extended the period of three years within which to pay the duties without the surety's consent, it cannot be doubted that such an extension of time would have discharged the surety, because it extended the duration of his risk. *U. S.* v. *Hillegas, supra.* By the regulations (article 158 of 1868; article 799 of 1874) such extensions of time are to be granted only upon the "concurrence of the surety." Or, had the secretary directed the delivery of the goods within the three years to the owner without payment of the duties owing upon them, and they were delivered accordingly, that also must have been held to be a discharge of the surety to the extent of the value of the goods released, as in cases between private individuals. "The United States," says the chief justice, in *U. S.* v. *Bostwick,* 94 U. S. 66, "when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens in the same circumstances will be implied against them."

An extension of the time of payment discharges a surety, because it prolongs his risk by postponing his right of payment and subrogation, and by depriving him of his right of immediate recourse by suit against his principal for indemnity at the time when the debt was originally due. The contract by such extension is varied to his prejudice. *U. S.* v. *Hillegas,* 3 Wash. C. C. 76; *King* v. *Baldwin,* 2 Johns. Ch. 560; *Warner* v. *Beardsley,* 8 Wend. 201; *Brown* v. *Williams,* 4 Wend. 360, 367.

The voluntary and deliberate postponement of the sale in this case effected precisely the same result, and operated in the same manner upon the surety's rights, as an extension of credit would have done. It necessarily prolonged his risk and suspended his right to proceed for his indemnity for three months, until after the next regular sale; and it resulted in a prolongation of fifteen months. As respects the surety, the postponement was precisely equivalent to an extension of credit to the owners of the goods until the next sale, and should, therefore, be held to discharge the surety in the same manner.

Under the authorities above cited, (*U. S.* v. *Kirkpatrick*, etc.,) mere laches by government officers in effecting a sale would not avail as a defence, but this affirmative postponement of the sale by the special order of the secretary of the treasury was not laches, any more than an express extension of credit would have been, nor was it an act in pursuance of "prescribed regulations." It was an isolated, independent order, contrary to those prescribed regulations." If one deliberate postponement can be upheld without the surety's consent, the sale may be postponed indefinitely, his risk be indefinitely extended, and his liability to loss through the insolvency of his principal be indefinitely increased. Such a liability to an indefinite extension of the surety's risk cannot have been designed, and ought not to be sustained, under the warehouse system, which requires sureties to be given to so vast an extent in the commerce of the country; nor can such a possibility be supposed to have been contemplated by the sureties who have entered into obligations under it.

The order of the secretary to withdraw the goods from sale was an absolute one, so far as related to the defendants. It was not made to depend upon their assent, nor was such assent required. That they would remain bound was assumed. "The interests of the government," referred to in the proviso, evidently relate to the goods and to the price to be obtained for them. It cannot be supposed that the secretary meant to submit to the decision of the collector the legal question whether the surety's assent was required or not. However this may be, the sale was postponed by the collector under this order, and the discretion conferred on him by it, and the government must be held bound by its legal consequences.

The result would be otherwise if I could find that at any time before sale the surety had any legal right to pay the debt and be subrogated to the possession of the goods, or any right of immediate suit against his principal; for in that case, the postponement of the sale having no effect upon the surety's immediate rights of payment, subrogation, or suit against his principal, would work no necessary extension of his risk, and therefore no legal injury. But, as the statute in question, and the policy it established, involve a loss of the surety's right of payment and subrogation to the possession of the goods, and the suspension of the government's right of action until after the sale, and consequently a suspension of the surety's right to proceed for his indemnity, I see no alternative but to hold a voluntary postponement of the sale without the surety's assent to be a discharge,

as involving a prolongation of his risk beyond the period contemplated by the implied terms of his agreement.

The case of De Visser, the principal in the bond, is different. It does not appear that upon his sale to Townsend, Clinch & Dike the latter personally assumed to pay the duties, or, if they ·did, that the officers of the government were apprised of that fact. The government, therefore, had no other principal to look to than De Visser. He was liable for the whole duties as importer, without limitation of time and irrespective of the goods held as security. *U. S.* v. *Phelps,* 17 Blatchf. 312, 316; *Dumont* v. *U. S.* 98 U. S. 142, 144; *U. S.* v. *Cousinery,* 7 Ben. 251; *U. S.* v. *Westray,* 18 Wall. 322. It does not appear, therefore, that he ever became, even in equity, a surety for any other person as principal to whom he could look for indemnity. The postponement of the sale involved, as respects him, no increase of risk, and no defeat or postponement of any right of recourse against another. His liability to be called on for payment might, upon sufficient facts proved, be postponed in equity, irrespective of the statute, until a sale of the goods had been had; but this equitable right has been observed. The injury to him, if any, would consist solely in delay in disposing of the security; and that alone, without notice from him to sell, or damages proved, is no defence.

Judgment must, therefore, be rendered in favor of the defendant Turnure, and against the defendant De Visser, with costs.

As the questions involved concern the daily transactions of the government to a large amount, I have given to the subject, in the absence of any known adjudications, the consideration which its importance has seemed to demand.