## UNITED STATES *v.* COPPELL *et al.*

*(District Court, S. D. New York.* February 13, 1891.)

CUSTOMS DUTIES—TRANSPORTATION BOND—LIABILITY OF PRINCIPAL AND SURETY.

Where transportation bonds, pursuant to sections 3000, 3001, Rev. St. U. S., were executed by principals and surety, conditioned for the transportation of merchandise from bonded warehouse in New York city to be entered and rewarehoused in New Orleans, La., and where such merchandise, through no fault of the principals on the bonds, was not entered at the port of New Orleans, nor rewarehoused therein, but was, upon arrival at New Orleans, shipped by rail to its destination in the republic of Mexico, through a mistake or oversight of the United States inspector of customs at New Orleans, *held,* that the principals and surety upon the bonds remained liable for double the amount of the duties upon said merchandise, according to the condition of the bonds and the provisions of sections 3000 and 3001, Rev. St. U. S.

At Law.

This was a consolidated action, brought by the United States government to recover the penalties upon two transportation bonds given by the defendants as principals and surety. The bonds were in the same form, both dated May 23, 1889,—one being in the penal sum of $100, the other in the penal sum of $300,—conditioned for the transportation from New York to New Orleans, La., of certain drums of caustic soda, which merchandise was contained in bonded warehouse at the port of New York. The condition in both of the bonds was in the usual form provided by articles 725 and 726 of the United States treasury regulations of 1884, and was as follows:

"Now, therefore, the condition of this obligation is such that, if the above-bounden principals shall within four months [days] from the date hereof transport or cause to be transported in Cromwell's line of steamers to New Orleans, and shall within the time herein specified deliver the same to the collector at the said port of destination, and cause due entry thereof to be made for rewarehousing, and shall also within the time herein specified produce to and deposit with the collector of said port of withdrawal a certificate of the collector of the said port of destination that the said merchandise has been delivered to him according to law and rewarehoused, and the duties thereon paid or secured, or, failing so to do, shall pay to the proper collecting officer of the United States at the said port of withdrawal the amount of duties to be ascertained as due and owing on the merchandise aforesaid, and an additional duty of 100 per cent., pursuant to the statute in such case made and provided, then this obligation to be void; otherwise it shall remain in full force."

The merchandise was withdrawn from bonded warehouse at the port of New York by two transportation entries in the usual form, both dated May 21, 1889, and providing that the "merchandise was intended to be withdrawn from warehouse by M. P. & Co. for transportation to New Orleans by route or vessel, Cromwell's line, SS. New Orleans." It was proved upon the trial that the merchandise in both cases was shipped at the port of New York on the steamer New Orleans, of Cromwell's line, on or about the 25th of May, 1889, and arrived in the said steam-ship at the port of New Orleans on or about the 3d day of June, 1889. The special manifest in each case was in the usual form prescribed by the

treasury regulations for the transportation of merchandise in bond from one collection district in the United States to another; and stated upon its face that the merchandise was "laden on board Cromwell's line for transportation and exportation to New Orleans in the state of Louisiana by way of ————, to be delivered to the collector or other proper officers of the customs on arrival at the port of destination;" and giving the consignees as "A. M. & Co." It was further proved that the general manifest of the steam-ship contained no special reference to the merchandise in question. The defendants offered testimony, which was received, under objections by the United States attorney, that it was their intention to ship the goods direct from the port of New York to the ultimate intended destination thereof in Mexico, but that they found upon inquiry that there was no bonded carrier between the port of New York and Mexico. They therefore proceeded to withdraw the goods from warehouse under the transportation entries above referred to, and to ship the same by the Cromwell line of steamers, which were bonded carriers, to New Orleans, intending to rewarehouse the goods at that port, and then to withdraw them for transport to Mexico. They therefore delivered the receipt or bill of lading received from the Cromwell line of steamers to the agent of the Mexican Central Railway Company, in the city of New York, and received from the Mexican Central Railway Company a bill of lading for the merchandise in question, providing that said merchandise should be transported from said initial line and connections, (viz., the Cromwell line of steamers,) and delivered to the Mexican Central Railway Company at El Paso, Tex., thence to be transported over the line of said Mexican Central Railway Company to Aguas Calientes, and delivered to the consignees, etc. It was shown by testimony taken in New Orleans in behalf of the defendants that the United States district inspector at New Orleans was notified by the delivery clerk for the Cromwell line that certain bonded freight was on board the steamer New Orleans, and that such United States district inspector came to the ship, and a special manifest of the bonded goods was delivered to him, and that the said United States inspector indorsed the same, and certified to the transfer of the merchandise to the cars of the Texas Pacific Railroad Company; that the merchandise was transferred and forwarded to Mexico by the Texas Pacific Railroad Company. It also appeared that A. M. & Co., the consignees of the goods at New Orleans, were the agents of the Cromwell line at that port. The defendants further introduced testimony, likewise against the objection of the United States attorney, showing that the merchandise in question arrived at Ciudad Juarez, in Mexico, about June 15, 1889, and that the usual "landing certificate" in respect to such goods was duly executed, which certificate was certified by the United States consul. In behalf of the government (plaintiff) testimony was introduced showing that the merchandise in question had never been delivered to the collector of the port of New Orleans personally, or to his chief deputy collector, and that there were no records at the New Orleans custom-house showing the delivery of the same; that it was 'the duty of the bonded common carrier to report the arrival of bonded mer-

chandise, which was not done in this case; and also that the two transportation entries, together with certified extracts of the invoices for the goods, were received at the office of the collector in New Orleans on May 27, 1889, having been forwarded to said collector by the collector of the port of New York in accordance with customs regulations, and had remained uncalled for since that date. It was also proved by the testimony of the United States district inspector of customs at New Orleans, above referred to, that he did not receive any verbal or written authority in regard to the case in question specially; that, if the manifest required that the bonded goods should be warehoused at New Orleans, then it was an oversight on his part not to require this to be done; and that by reason of such oversight the merchandise was allowed by him to be transferred to the port of ultimate destination without rewarehousing at New Orleans. At the conclusion of the testimony counsel for the plaintiff moved the court to direct a verdict for the government on the bonds.

*Edward Mitchell,* U. S. Atty., and *James T. Van Rensselaer,* Asst. U. S. Atty.

*Olin, Rives & Montgomery,* for defendants.

BROWN, J. On the first question I think it my duty to rule for the government, as regards the contingencies that prevented the intention of the shippers from being carried out and the undertaking specified in the bond from being fulfilled. All such contingencies as interfere with the performance of the stipulations of a bond like this are at the risk of the bondsmen and owners of the goods who undertake to transfer them from one warehouse to another. So far as the United States are concerned, this bond did not contemplate any transportation of the goods to Mexico. No doubt that was the ultimate intention of the owners; but, finding that they could not make any arrangement to send the goods directly to Mexico, because the carriers had not given the bonds required by law to enable them to take goods there, a different proposition had to be made to the government, which was simply that the goods should be transported from the warehouse in New York to the warehouse in New Orleans. This bond, construed with the statutes and regulations, imports virtually a contract between the parties and the government to do that thing, and nothing more. The government had possession of the goods, holding them for duties. It was the right of the importers under the laws to ship them directly and continuously to Mexico, provided they could find carriers who complied with the necessary conditions. Not being able to do so, they had to avail themselves, therefore, of another provision of the law, which allowed a removal of the goods from the warehouse in New York to the warehouse in New Orleans. That they arranged to do by giving the bond upon which this suit is brought. The government officers having the goods in their possession for the payment of duties, could not release them or deliver possession of them to any one, except under the provisions of law by which the duties are either to be paid or secured. The law provides for the removal from one port of the United States to another port in

the United States upon conditions somewhat different from those for removal to a foreign country; and, as these owners could not remove the goods directly to Mexico, they arranged to remove them to New Orleans. That was all that the United States assented to in this case, although I have no doubt that it was merely the first step, so far as the shippers were concerned, in the intended transportation to Mexico. In order to remove the goods to the New Orleans warehouse the defendants gave this bond, which provides expressly that they shall deliver the goods to the collector there, enter them suitably for warehousing, and then produce here a certificate that the goods have been warehoused there. The last two provisions are merely designed to secure the first, namely, the proper delivery to the collector there. The proper delivery for warehousing must be made by means of an entry for warehousing. The defendants agreed to make that entry, or else pay double the amount of duties imposed upon them here. Such a bond is one that it is competent for the secretary of the treasury to require under the act of congress.

*Mr. Rives.* We make no exception to that point, your honor.

BROWN, J. Section 3000 states what should be done:

"Any merchandise duly entered for warehousing may be withdrawn under bond, without payment of the duties, from a bonded warehouse in any collection district, and be transported to a bonded warehouse in any other collection district and rewarehoused thereat; and any such merchandise may be so transported to its destination wholly by land, or wholly by water, or partially by land and partially by water, over such routes as the secretary of the treasury may prescribe; and may be likewise conveyed over any foreign territory, the government of which may have or shall by treaty stipulations grant a free right of way over such territory."

The next section provides:

"The secretary of the treasury shall prescribe the form of the bond to be given for the transportation of merchandise from a port in one collection district to a port in another collection district, as provided in the preceding section, also the time for such delivery; and for a failure to transport and deliver within the time limited any such bonded merchandise to the collector at the designated port a duty of double the amount to which said merchandise would be liable shall be collected, which duty shall be secured by such bond."

That is a statutory requirement, which the secretary had no right to waive. He was required to take a bond, in which, among other things, it was conditioned that, if this delivery was not made as required, double duty should be paid. Concede, then, all that has been testified to in this case. The goods arrived at New Orleans under a special manifest, which on its face showed what was the obligation of the parties there, namely, to deliver them to the collector at New Orleans for warehousing. This required not merely a nominal and formal delivery to some representative of the collector, or the mere bringing of them into the collection district, but an actual entry, and a delivery of them to the collector for warehousing. And, that there should be no doubt about that, the regulation of the treasury department prescribes that specific duty, and that

is one of the conditions of this bond. That was a suitable provision to secure the object of the statute. When the goods arrived at New Orleans it was no doubt through the mistake or blunder of the inspector of customs there that the proper disposition of the goods was not made. They were not sent to the warehouse. No steps were taken to that end; but the inspector, having been notified that there were goods in bond there on the vessel, looks at the paper,—this very manifest, which it is proved was put into his hands,—indorses it, makes some memorandum upon it, and then directs the goods to be loaded on the Texas Pacific cars for El Paso. They were so shipped, and went on to Mexico. No doubt, if there had been any existing agreement by which the government had arranged for the transportation of these goods to Mexico, the inspector's act would have been a mere irregularity, from which it suffered no harm or loss. But it is impossible for the court to look beyond the actual arrangement to which the government was a party; and, as I said in the beginning, the only arrangement to which the government was a party was a transfer of these goods from a New York bonded warehouse to a New Orleans bonded warehouse. That was interrupted, as may be assumed from the evidence in this case, by no fault whatever of the shippers; no more than if the ship had foundered on the voyage, or the goods been burned at the wharf, or captured by pirates, or otherwise lost. The intention of the shippers was defeated, indeed, by something over which they had no control; but nevertheless the thing that they had contracted for was not done. At whose risk were these contingencies? Upon a bond like this, they were, I think, at the risk of the bondsmen. The government, having possession of the goods for the purpose of collecting duties, in effect says to the owner: "You may ship the goods to New Orleans, if you choose; but you must put them in warehouse there, as security for the duties; and you must take all the risk of the passage, and of whatever may defeat the due entry of the goods for warehousing in New Orleans,"— save perhaps the act of God and of public enemies. What the owners and these defendants agreed to do has not been done, and the government loses its duties. Is it any defense in a suit upon such a contract to say that the goods failed to reach the warehouse through no fault of the defendants? I think not. The inspector's negligence, if it was simple negligence, was not legally chargeable against the government as its own negligence. The inspector's fault was not the government's fault. The government did not assume these risks. On this ground I must direct a verdict for the government, there being no disputed question of fact. I have purposely received almost all the evidence offered, in order to show as fully as possible the facts as to these two points, viz.; whether the failure to warehouse in New Orleans occurred by any fault on the part of the shippers; and, second, whether the goods did go into Mexico, where the owners intended them to go; so that the legal question may be presented in its simplest form, and any error on my part, if there be error, most easily reviewed and corrected. On both points I am quite satisfied; so that, if the defendants' design

had been accomplished by the government's assent, and in the way provided by law, the government would not have lost anything. But I must hold the defendants liable, for the reason that the government never did assent, and was no party, to the defendants' ultimate design. The only arrangement the government made was that it would permit the removal of the goods from the New York bonded warehouse to the New Orleans bonded warehouse, leaving the parties, after the goods arrived there, to obtain by some new arrangement with the government the right to remove the goods to Mexico. Verdict directed for the plaintiff in double the amount of the duties, with interest.