# CASES

IN THE

# SUPREME JUDICIAL COURT

OF THE

## STATE OF MAINE

STATE OF MAINE *vs.* INTOXICATING LIQUORS,

William G. McAdoo, Director General of Railroads, Claimant.

Penobscot.   Opinion March 11, 1920.

*Intoxicating liquors. Seizure. Label. Forfeiture. Appeal by claimant. Imported and entered at port in Chicago, Illinois, for warehousing in bond. Transportation from bonded warehouse in Chicago to warehouse at the port of Bangor, Maine. Duties. Revenue tax. Imposition and collection of duties on imports. Federal authority. Federal control. Waiver or surrender of the Federal Government's rights. Webb-Kenyon Act. Director General of Railroads. Interference by State authorities with Federal authorities. Illegal seizure.*

Ninety-one cases of Scotch whiskey were seized at Bangor on October 22, 1918, at the inward freight shed of the Maine Central Railroad Company by the sheriff of Penobscot County. The liquor was duly libelled, claim was duly filed and the liquors were ordered forfeited to the State. An appeal was taken by the claimant to the Supreme Judicial Court and thence brought to the Law Court on an agreed statement of facts.

The liquors seized were a part of a shipment of four hundred cases imported in June, 1917, by the Loma Grande Company of Chicago, Illinois, from Glasgow, Scotland, through the port of New York and entered at the port of Chicago for warehousing in bond, no duties having been paid.

On September 30, 1918, ninety-six of these cases were withdrawn by the Loma Grande Company from the bonded warehouse in Chicago for transportation via the Grand Trunk Railway and rewarehousing at the port of Bangor, Maine. The transportation bond required by the Federal statute was given. The

total amount of duties and revenue tax due and unpaid on the liquor so withdrawn was $1041.69. The liquor was loaded on a car of the Grand Trunk Railway at Chicago and transported under seal affixed by a representative of the Collector of Customs to Bangor, Maine, two transhipments being made en route under the direction of the Customs department. On arrival at Bangor the car was unloaded by permission of the deputy collector and the liquor was placed in the inward freight shed. It was there seized four days later. Neither payment nor tender of the unpaid customs duties thereon was made by the sheriff.

*Held:*

1.  That the exclusive power governing the imposition and the collection of duties on imports is vested in the Federal Government under U. S. Const. Article I, Section 8, Clause 1.

2.  This power cannot be interferred with by the State. A State law which in itself is valid as regulating purely internal affairs, is nugatory when it comes into collision with the constitutional provisions and acts of Congress regulating the collection of duties and imports. The collection of duties is as sacred as their imposition.

3.  At the time of this seizure the goods were, in the eye of the law, in the custody of the revenue officers of the United States, or their designated representative, as they were being transported in bond from the custom house in one customs district to the custom house in another district for rewarehousing, the duties not having been paid, and the rewarehousing not having been completed.

4.  Every provision of the Federal statutes protecting the U. S. Government in its lien was observed in this case, and at no point was the custody of the Government released or withdrawn. While the goods were in transit under bond in the sealed cars they were virtually under Government control.

5.  The fact that at Bangor the goods were removed from the car and placed in a railroad freight shed by permission of the deputy collector did not terminate the custody on the part of the Government. They had not reached their destination, the consignee being the Collector of Customs and the depository being the U. S. Custom House. The deputy did not intend to waive or surrender the Government's rights, and he had no authority to do so. Any attempted act outside the scope of his authority would have been void.

6.  The Webb-Kenyon Act so-called has no application here. That Act was designed to divest intoxicating liquors of their character as interstate commerce sooner than otherwise would have been the case, but had no effect upon the revenue laws of the United States for the collection of duties on imports.

7.  The Director General of Railroads, under all the circumstances of the case, as the representative duly designated by the United States to transport this liquor under bond, and having given an obligation therefor, has sufficient interest to entitle him to appear as claimant.

8.  The act of the State authorities in seizing and holding this liquor constituted an interference with the Federal authorities acting within their constitutional rights. It was therefore an illegal seizure.

On October 22, 1918, at the inward freight shed of the Maine Central Railroad Company, at Bangor, Maine, the sheriff of Penobscot County, seized ninety-one cases of Scotch whiskey. The liquor was duly libelled. William G. McAdoo, as Federal Director General of Railroads, operating the Maine Central Railroad, through counsel appeared as claimant. Claim was duly filed and the liquors were ordered forfeited to the State. An appeal was taken by the claimant to the Supreme Judicial Court, and the case thence went to the Law Court on an agreed statement of facts. Claim sustained. Order to issue for the return to the claimant of the liquors seized.

Case stated in the opinion.

*Guy H. Sturgis*, Attorney General, *and Albert L. Blanchard*, County Attorney, for the State.

*Charles H. Blatchford*, for claimant.

SITTING: CORNISH, C. J., SPEAR, HANSON, WILSON, DEASY, JJ.

CORNISH, C. J. The general outline of this case is as follows: Ninety-one cases of Scotch whiskey were seized at Bangor on October 22, 1918, at the inward freight shed of the Maine Central Railroad Company by the sheriff of Penobscot County. The liquors were duly libelled and claim was filed by James E. Gibbons, the freight agent of the company at Bangor, for and in behalf of William G. McAdoo, Director General of Railroads, then operating the railroads of the country under a Proclamation of the President of the United States dated December 26, 1917, and the act of Congress of March 21, 1918. Hearing was had in the Municipal Court, and the liquors were ordered forfeited to the State. An appeal was taken to the Supreme Judicial Court for Penobscot County and thence brought to the Law Court on an agreed statement of facts.

From that statement it appears that the liquors seized and libelled were part of a shipment of four hundred cases of Scotch whiskey imported in June, 1917, by the Loma Grande Company of Chicago, Illinois, from Glasgow, Scotland, through the port of New York and entered at the port of Chicago for warehousing in bond, the bond given by the importer bearing date June 27, 1917.

On September 30, 1918, ninety-six cases were withdrawn by the Loma Grande Company from the bonded warehouse at Chicago for transportation via the Grand Trunk Railway, and rewarehousing at

the port of Bangor, Maine. The statutory transportation bond for this rewarehousing was given by the Loma Grande Company. The total amount of duties and revenue tax due on the liquors so withdrawn was $1041.69, and the ninety-one cases seized by the sheriff were a part of the ninety-six cases withdrawn at Chicago.

On September 28, 1918, a "Carriers United States Customs Manifest of Goods Subject to Customs Inspection" had been issued reciting that the goods were shipped by the Loma Grande Company, "in bond via Grand Trunk Ry. consigned to the Collector of Customs at Bangor, final destination, Bangor, Maine, consignee, c-o William McGinnis, W. A. Ross & Bros."

It is inferable from the agreed statement that the Loma Grande Company had sold these ninety-six cases to W. A. Ross & Bros., and they in turn had sold them to William McGinnis, who, after the goods had been duly rewarehoused at the Customs House in Bangor intended that the same should ultimately be sold in this State in violation of law.

The liquor was loaded on a car of the Grand Trunk Railway at Chicago, duly sealed by a representative of the Collector of Customs of that port and moved forward under original seal protection to Island Pond, Vermont, on the line of the Grand Trunk Railway, at which point it became necessary to transfer it to another freight car on the line of the Maine Central Railroad, which car was also duly sealed by a Customs inspector. At North Stratford, N. H. the property was again transferred and sealed by another Customs inspector, this car arriving at Bangor via Maine Central Railroad on October 18, 1918, under the seals so applied at North Stratford. The car was placed for unloading on that day. By permission of the deputy collector at Bangor the car was unloaded by representatives of the claimant and the liquor was placed by them in the inward freight shed of the Maine Central Railroad Company. It was seized at this shed by the sheriff four days later, on October 22, 1918. Neither payment nor tender of the unpaid customs duties thereon was made by the sheriff.

The claimant does not seek to regain the liquor as a common carrier on the ground that its seizure by State authorities was in violation of the commerce clause of the Constitution of the United States, Article 1, Section 8, Clause 3, which vests in the Federal Government the constitutional right to regulate commerce between

the several States. Under that clause and under the Act of Congress of August 8, 1890, the Wilson Act so-called, U. S. Comp. Statutes, 1916, Section 8738, the courts held that the shipment of intoxicating liquors from one State into another was protected from State interference until the interstate shipment had terminated, that is until actual or perhaps constructive delivery to the consignee. *Heyman* v. *Southern Railway Co.*, 203 U. S., 270; *State* v. *Intox. Liquors*, 102 Maine, 385; *State* v. *Intox. Liquors*, 104 Maine, 463. This protection however was withdrawn by the passage of the Act of March 1, 1913, the Webb-Kenyon Act so-called, U. S. Com., Stat. 1916, Section 8739, so that such a claim by a carrier can be no longer maintained.

The claimant rests his case upon another and entirely different ground, namely, the exclusive power of the United States governing the imposition and collection of duties on imports under the Federal Constitution and the Acts of Congress passed in furtherance thereof. Article 1, Section 8, Clause 1, reads: "The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." This power is vested solely in the Federal Government which can establish such methods for the collection of its duties as it may seem advisable. They are to be self-administered and not to be thwarted or hampered by the State, *U. S.* v. *Snyder*, 149 U. S. at 214, even in the attempted exercise of its police power. *Flaherty* v. *Hanson*, 215 U. S., 515. A State law which, in itself, is valid as regulating purely internal and intra-State affairs is nugatory when it comes into collision with an act of Congress regulating the collection of duties on imports. These fundamental and firmly established principles of law underlie the problem which has been submitted to this court.

The first question, therefore, which arises is whether the act of the State authorities in seizing and holding the liquors in the instant case constituted an interference with the Federal authorities in their constitutional right to collect the duties on these imported goods and to employ every power and means authorized by Congress to enable them to enforce such collection. If the act of the sheriff deprived the Federal authorities of a single remedy possessed by them, even though others remained, it must be held to be an invasion of the Federal domain and therefore nugatory. To permit one remedy or

mode of protection to be taken away would open the door to repeated invasions and to the destruction of all methods for the preservation of its rights of collection. The collection of duties is as sacred a constitutional right as the power to impose them.

In order to answer this vital question of interference or non-interference it is necessary to determine whether at the time of the seizure the goods can be said to have been in any sense in the actual or constructive custody of the United States, either through its Customs officials or other designated agents or representatives, and also whether that custody could be retained until all accrued duties and taxes were paid.

We think both questions should be answered in the affirmative, and, if so, it follows that the act of seizure by the State official was unwarranted.

I. Custody by the United States either through its Customs officials or other designated agents or representatives.

Let us briefly trace these goods from the moment of their importation until their seizure, and ascertain whether at any time and, if so, when, they were out of the actual or constructive custody of the United States Government.

It appears that they arrived at the port of New York, on the steamship Tuscania from Glasgow, Scotland, but were not entered in the New York Custom House. The importer and owner, the Loma Grande Company, being a resident of Chicago, Illinois, preferred to make that port the port of entry, as it had a legal right to do. The goods were therefore shipped to Chicago. The owner then had the right either to pay the duties and take the goods from the possession of the Government, or to withhold payment, enter them in a bonded warehouse, giving a warehouse bond, and leave them in the possession of the Government. It adopted the latter course. The goods were therefore deposited in the warehouse and a warehousing bond was given, with a guaranty company as surety, conditioned within three years either to withdraw the goods on payment of the duties and charges or to export them. This bond is given by the importer simply as further security for the duties, not in payment of them. *U. S. v. Lyman,* 1 Mason, 481. The condition of the bond is not directly for the payment of duties but for the withdrawal or exportation of the goods within the three year period "because the Government does not intend either to hold the goods indefinitely or to look

to the goods alone for the payment of the duties or to take the risk of loss that may attend holding them." *U. S.* v. *Georgi,* 44 Fed., 255-257; see also *Clark* v. *Peaslee,* 1 Cliff., 545, 554.

At the time of importation and entry when the duties accrue, a lien therefor attaches with the accompanying right of custody, and a personal debt is also created against the importer. When the goods are warehoused the Government takes in addition the required bond. So that it then has three distinct remedies; a debt against the importer, a lien upon the goods themselves, and a bond for further security. These remedies are independent one of another, and the bond discharges neither the personal debt nor the lien. It is cumulative rather than alternative. *U. S.* v. *Cobb,* 11 Fed., 76; *Mosle* v. *Bidwell,* 119 Fed., 480; *Meredith* v. *U. S.,* 13 Pet., 486.

While, therefore, these goods remained in the bonded warehouse in Chicago they were in the actual custody and exclusive possession of the Government, which possession could not be surrendered, except on exportation, or under a decree of the United States Court, (Customs Reg., Section 731), until all duties and charges were paid. *U. S.* v. *De Visser,* 10 Fed., 642; *Pattison* v. *Gale,* 196 Fed., 5; *Hartranft* v. *Oliver,* 125 U. S., 525, 528; *Guesnard* v. *L. & N. R. R.,* 76 Ala., 453. This rule was recognized by this court in *Peabody* v. *Maguire,* 79 Maine, 584, where it was held that there could be no actual attachment by a State officer of goods held in bond, although of course the consignee as having the general property in the goods, subject to the lien, could be held as trustee under our garnishee or trustee process.

Nor was this lien surrendered by the Government when a portion of the goods was withdrawn from the bonded warehouse at the port of Chicago for transportation to a bonded warehouse at the port of Bangor. Such rewarehousing is authorized by Section 5685 which reads: "Any merchandise, duly entered for warehousing, may be withdrawn under bond, without payment of the duties, from a bonded warehouse in any collection district, and be transported to a bonded warehouse in any other collection district, and rewarehoused thereat; and any such merchandise may be so transported to its destination . . . . over such routes as the Secretary of the Treasury may prescribe" &c.

By its very terms, the merchandise is still held under bond by the Government. The language is, "may be withdrawn under bond" and may be "so" transported, that is transported under bond or as

bonded merchandise over such routes as the Secretary of the Treasury may prescribe. Section 5698 requires that merchandise "shall be conveyed in cars, vessels or vehicles securely fastened with locks or seals under the exclusive control of the officers of the customs." The Government does not intend to release its grip upon the goods themselves. It keeps them, in transit as in the warehouse, "under bond," and so long as imported goods with duties unpaid are under bond they may not be interfered with by State authorities. This we think is a necessary corollary of the powers of the Federal Government.

The fact that in order for an importer or owner to avail himself of this rewarehousing section he must give an additional bond or obligation as provided in Section 5686, in no way affects the existing rights of the Government in the bonded goods themselves while being transported. It neither destroys nor takes the place of the Government lien. It does not purport to do so. For a failure to transport and deliver the bonded merchandise to the collector at the designated port within the prescribed time (here 120 days) the obligor is liable to pay double the amount of the duty. This is simply an additional contract between the parties specifying what the penalty shall be if the goods are not rewarehoused with the collector of the second port, and this requires not merely the bringing of them into the collection district or the nominal delivery of them to some representative of the collector but an actual entry and delivery of them to the collector for rewarehousing. *U. S.* v. *Coppell*, 48 Fed., 367.

Every provision protecting the Government was observed in this case, and every step in the journey from one customs district to the other was under the supervision of customs officials, so that the lien might not be lost. The goods were placed in charge of a carrier which had been designated by the secretary of the treasury. This was the Grand Trunk Railway. The Director General represents both that road and the Maine Central Railroad over which, as a connecting road, the goods were brought to Bangor. The car was sealed by customs officials at Chicago. When it became necessary to transfer the goods at Island Pond, Vermont, and again at North Stratford, N. H. the transfers were made under the inspection of customs officials and by them each car used was again securely sealed. Under that protection the goods reached Bangor. At no point between the departure from Chicago and the arrival in Bangor was the custody

of the Government released or withdrawn, and while the goods were in transit under bond in the sealed cars they were still under Government control. *Galveston &c. Ry. Co.* v. *Terrazas*, (Tex. Civ., App. 1914) 171 S. W., 303.

This control was not affected by what took place on arrival at the Bangor station. The consignee was the Collector of Customs and the depository was the United States Custom House. By permission of the deputy collector the seals of the car were broken and the liquors were removed from the car to the railroad freight shed. This however did not terminate the custody on the part of the Government. It was simply another stage on the journey. *Rhodes* v. *Iowa*, 170 U. S., 412. There was no purpose on the part of the Government to relinquish its right of possession. The agents of the claimant told the sheriff before seizure: "It is in bond, you can't touch it." Moreover the deputy could not waive or surrender the Government's rights even if he had desired or attempted to do so. He had no authority to do so. As a public official he represented the United States within the scope of his authority but not outside it, *U. S. Fid. & Guar. Co* v. *U. S.*, 220 Fed., 592; *Hart* v. *U. S.*, 95 U. S., 316; *Minturn* v. *U. S.*, 106 U. S., 437; *U. S.* v. *Witten*, 143 U. S., 76, and any act outside the scope of his authority was void so far as the Government is concerned.

The liquor was therefore still in bond, still under the Government control, when it was seized by the sheriff. It had not become a part of the common property of the State. The lien for duties still remained in full force and the consequent right of custody to enforce the lien. With this lien for duties went also a lien for the freight charges of the carrier, and the customs officers are authorized by statute to retain the goods until both are paid. In case of forfeiture and sale the carrier is compensated out of the proceeds for its freight charges as well as the Government for its duties. Section 5667, U. S., Cus. Reg., Section 732. All dealings with goods in bond must be subject to the paramount rights of the United States. Here those rights were ignored.

The three cases cited by the learned counsel for the State, we do not regard as adverse to the position here taken. In *U. S.* v. *Coppell*, 48 Fed., 367, a case already referred to and quoted from, an action was brought on the rewarehousing bond and the single point decided was that the mistake or blunder of the inspector of customs at the

port of destination in making a wrong disposition of the goods was no defense. It was held to be one of the contingencies against which the defendant had covenanted. The obligor and not the Government assumed the risks of transportation. That is the limit of the decision.

In *Ferry* v. *U. S.*, 85 Fed., 550, another section of the statutes was under consideration, viz: Section 5677, providing for the refunding of duties paid on goods destroyed while in the custody of the United States. It appeared that under Section 2899 of the former revision an importer cannot receive from the custody of the customs officers any imported merchandise until it has been inspected and appraised and found to be correctly invoiced, unless a bond be given under that section in double the estimated value of the goods, conditioned that it shall be redelivered to the custody of the collector within ten days after the package sent to the public stores has been appraised and reported to the collector. This importer before appraisal, had received and taken these goods to his own warehouse where they were destroyed by fire, and therefore they were held to be in his manual possession and not in the possession and custody of the United States.

That is not this case. But the language of Section 5677, under which that claim was made, throws light upon the conditions under which goods are deemed by Congress to be still within the custody and possession of the Government because it provides for such refunding in case of accidental fire or other casualty while the goods remain in the custody of the customs officers in any public or private warehouse ''or while in transportation under bond from the port of entry to any other port in the United States.''

The third case, *U. S.* v. *Pingree*, 1 Sprague, 339, Fed. Cas., No. 16050, was reversed upon appeal to the Circuit Court, as appears by a note, 1 Sprague 342. The reversing decision is unreported.

It is our conclusion therefore on this branch of the case that under the Federal statutes then in force, and under all the facts of the case at bar, these liquors while being transported in bond were within the possession and custody of the United States, within the purview of the customs laws at the time of the seizure, with a lien attached for the payment of duties and charges, and therefore were protected from seizure by State authorities.

II. *Effect of Webb-Kenyon Act.*

It is further contended by the State that the legal effect of the Webb-Kenyon Act, making it illegal for carriers to transport intoxicating liquors into States whose local laws prohibit their sale (of which

Maine is one) was to make such liquors contraband on arrival in those States, possessing no rights which the courts are bound to respect.

If these liquors were claimed here under the interstate commerce clause of the Constitution that defense would avail, as we have before stated; but to hold that these imported goods, notwithstanding they were moved in accordance with the customs laws of the United States, became contraband upon entering Maine and subject to local seizure, is in effect to hold that the Webb-Kenyon Act not only regulated interstate commerce traffic but also nullified the revenue laws of the United States, and repealed by implication an important portion of them. This is a result to which we cannot accede. The Webb-Kenyon Act has been construed by courts in many jurisdictions both State and Federal, see notes of decisions, U. S., Comp. St., Section 8739, Vol. 8, page 9538-40, and in no decision have we been able to find even a hint that anything more was effected or intended by its passage than a valid exercise by Congress of the power to regulate commerce between the States under the commerce clause of the Constitution, and to divest intoxicating liquors of their character as interstate commerce sooner than otherwise would have been the case. It brings them within the police power of the State as soon as they cross the State line, thereby supplementing and aiding the prohibitory laws of the State. *State* v. *Seaboard Air Line,* 84 S. E., 283 (N. C.); *State* v. *Grier,* 88 Atl., 579 (Del.). That was the utmost limit of its effectiveness and is in harmony with the title of the original act, which is "An Act divesting intoxicating liquors of their interstate character in certain cases." The Webb-Kenyon Act was absolutely independent of and unconnected with the revenue laws of the United States and the collection of duties upon imports, and it cannot be forced to repeal by implication an essential branch of those laws. Repeal by implication exists in two classes of cases, first, when the later statute covers the whole subject matter of the earlier, especially when additional remedies are imposed, and second, when the later is repugnant to or inconsistent with the earlier. None of these conditions applies here. The revenue acts were passed under one clause of the Constitution, the regulation of interstate commerce, embodied in the Webb-Kenyon law, under another. They neither cover the same subject matter, nor are they repugnant to nor inconsistent with each other. Each moves along in its own sphere unaffected by the other.

At the time this liquor was imported into the United States, which was before the adoption of the 18th or prohibitory Federal amendment and the passage of laws thereunder, it was a legitimate and dutiable article of merchandise which the laws of the United States permitted to be entered at designated ports of entry. This was entered at the Custom House and warehouse in Chicago. Under the then existing laws it could be legally rewarehoused in any other district in the United States, and that rewarehousing was as legal and valid as the original warehousing. The right to rewarehouse did not depend upon whether the new district was or was not within a prohibitory State. To hold that, is to amend and partially nullify Sections 5685, 5686 and all the other sections regulating rewarehousing. There is no such limitation. For illustration, suppose Bangor had been the port of original entry, would it be contended that in 1918 this whiskey, arriving on board a vessel from Scotland, and coming up the Penobscot River, could not have been entered in the Custom House in that city and placed in a warehouse under bond, by complying with the customs laws and regulations? Would it not have been absolutely free from State interference until it had reached its final destination? If it could have been so entered at Bangor directly and originally, then it could first have been entered at Chicago and rewarehoused in Bangor, because the one is as fully protected from State interference as the other. The adoption of the 18th amendment and the enactment of legislation thereunder have changed the situation, because no duties can legally accrue upon the importation of goods prohibited by the Federal Government. As such they are not entitled to be entered at the custom house nor to be bonded. *M'Lane v. U. S.*, 6 Pet. at 404. But prior to that adoption and legislation, intoxicating liquors, so far as import duties were concerned, stood on a plane with all other kinds of merchandise in the contemplation of the Federal laws.

III. *Legal Status of Claimant.*

Finally it is claimed by the State that the claimant has no legal standing in this court because he has no legal interest in these proceedings.

The words of the statute defining the qualifications of a claimant are these: ''If any person appears and claims such liquors, or any part thereof, as having a right to the possession thereof at the time when the same were seized, he shall file with the magistrate such claim

in writing, stating specifically the right so claimed and the foundation thereof," &c.  .  .  .  .  R. S., Chap. 127, Sec. 31, and the court passes upon his right "to the custody" of the liquor seized. The claimant may be the owner, or the agent or representative of the owner, or one having a special property in the goods which gives a legal right to their custody as against one having no right. *State* v. *Intox. Liquors,* 83 Maine, 158; *Same* v. *Same,* 112 Maine, 393. This section has been interpreted by our court as follows: The claimant "might show it was the owner, or that it was a carrier still responsible for the liquors to the shipper or consignee, or it might show any other facts which would entitle it to the custody." *State* v. *Intox. Liquors,* 112 Maine, 138, 141.

The claim here does not rest upon ownership, nor upon the rights of a common carrier under duties owed to the shipper or owner, but upon other facts entitling him to the custody, namely, upon his rights as the representative duly designated by the United States to transport this liquor under bond in accordance with the revenue laws, from the possession of the Customs officers in Chicago to the possession of the Customs officers in Bangor. Mr. Gibbons, the party signing the claim, did so for and in behalf of the Director General, and the foundation of his claim was stated to be that said property when seized was in his possession and custody as said agent while it was being transported in bond under the Carriers United States Customs Manifest consigned to the Collector of Customs at Bangor in bond from Chicago for rewarehousing under the provisions of the Federal Statutes and customs regulations. As such designated representative to complete the transportation in bond, he has given an obligation to the United States, conditioned upon the safe transportation and delivery of the goods to the collector at Bangor, and has made himself as Director General liable to pay an amount equal to the duties thereon, $1041.69, in case of non-delivery.

Under the circumstances disclosed in this case we think the Director General may be regarded as a legal claimant. The claim of the United States Government is really before this court through him.

Upon the whole case the conclusion of the court is that the following mandate must be sent down.

> *Claim sustained.*
> *Order to issue for the return to the*
> *claimant of the liquor seized.*